Lawrence A. **ROBINSON** et al.

v.

**ZAPATA COUNTY, TEXAS,** et al.

Civ. A. No. 72-L-35.

United States District Court,
S. D. Texas,
Laredo Division.

Oct. 31, 1972.

H. H. Rankin, Jr., McAllen, Tex., for plaintiffs.

Kenneth Oden, Alice, Tex., for defendants.

## MEMORANDUM AND ORDER

OWEN D. COX, District Judge.

The named Plaintiffs here, and those they purport to represent, are qualified and registered voters in the County Commissioner's Precinct No. Four, as the boundaries now stand, in Zapata County, Texas. They seek relief from what they consider a violation of their constitutional rights to equal protection under the Fourteenth Amendment because of the way the Commissioner's Court went about redistricting so as to comply with the one-man, one-vote principle.

These Plaintiff voters in 1970 were living on the same plot of ground where they now live. They were living there in 1968 and that year voted in Precinct No. One for the office of County Commissioner. The voters in the other precincts also voted for their respective commissioners. At that time, there was a considerable lack of uniformity in the number of persons eligible to vote as between the four County Commissioner precincts. Avery v. Midland County, Texas, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968), required something be done to equalize the voting strength.

In August of 1970, the Commissioner's Court issued an order redistricting the four commissioner precincts. This action was taken pursuant to a study authorized in August of 1968. The parties have stipulated the facts of the rearrangement of the dividing lines between precincts and the number of voters in each precinct, and that the action of August, 1970, was taken in good-faith effort to comply with the one-man, one-vote principle. The lines between precincts were so drawn that the voters in each area were reasonably close to equal in number. Then, in September of 1970, by an amended order, the Zapata County Commissioners provided the reapportionment would become effective on January 1, 1971.

But the Commissioner's Court, without any apparent justification, did not stop with what this Court considers a constitutional division of the voting strength as between said precincts. Instead of extending the boundaries of Precinct No. Four, as it then existed in the southernmost part of the county, northward and thus add to it a considerable number of voters originally in the adjacent Precinct No. Three, the Commissioner's Court made a much more drastic change. Precinct No. Four was moved to the northernmost part of the county. This New Precinct No. Four included *no* voters who lived in former Precinct No. Four, but it did include a very large number of voters who had lived in and previously voted in the former Precinct No. One.

The boundaries of the former Precinct No. Three were extended to the south, so that most of the former Precinct No. Four voters were included in and became a part of a new Precinct No.

Three. The new Precinct No. One, now in the southeast part of the county, was made up of leftover voters from former Precincts No. Three and No. Four.

The area originally included in Commissioner's Precinct No. Two was increased in size to some degree by expanding it over a portion of what was originally Precinct No. One, but it did not change its spots very much and continued, as expanded, as Commissioner's Precinct No. Two.

Now that we have explained, rather clumsily it seems, what happened in the shuffle, we must look at those voters who were formerly in Precinct No. One and are now in Precinct No. Four. These voters generally still live on the same property in the northeast part of the county as they did when that was Precinct No. One. Except for a few, the great majority of the voters who had in 1968 voted for the County Commissioner for Precinct No. One, woke up on January 1, 1971, and, without having physically moved, found themselves in Precinct No. Four.

However, all this wouldn't really be of such serious consequence except for what happened in the interim. The Constitution of the State of Texas was amended subsequent to the general election in 1968 but before the 1970 general election to provide for staggered terms for County Commissioners over the State of Texas, and, in order to effect this change, the Commissioners of Precincts Two and Four were to be elected in 1970, and the Commissioners of Precincts One and Three are to be elected in November, 1972. The fact that the adoption of the staggered terms of office makes it necessary to elect the various County Commissioners over the entire state in the manner outlined does not constitute a constitutional violation of the Fourteenth Amendment. Pate v. El Paso County, Texas, et al., 324 F. Supp. 935 (W.D.Tex.1970), affirmed 400 U.S. 806, 91 S.Ct. 55, 27 L.Ed.2d 38.

Next, the Court will direct its attention to what the staggered terms and the alternate election years did to those people who lived in the southernmost part of the county. In 1968, they voted for County Commissioner of Precinct No. Four. In 1970, pursuant to the constitutional change to staggered terms, they again were entitled to vote for and did elect a County Commissioner of their own choosing to represent them. The County Commissioner thus elected must have lived there and we can assume he still does. But now, because of the January, 1971, change of precinct designation, he does not represent that group of people any more. It may be a problem to figure out who represents the voters of the former Precinct No. Four. But, most of them live in the present Precinct No. Three and will get to vote for their own precinct commissioner in 1972, as will those who live in the new Precinct No. One. So, they're not hurt too bad. Since the voters in Precinct No. Two remain pretty much the same as before the change, their problem is not acute. These voters do not complain.

But, those abused people in former Precinct No. One, who brought this suit, didn't get to vote for a County Commissioner in 1970. They were still in Precinct No. One on election day and the constitutional amendment said the voters in that precinct could not vote until 1972. But, that wasn't too bad, and certainly not a constitutional abuse under *Pate*. After all, they would get their bite of the apple in '72. But, things didn't work out that way. As of January 1, 1971, those former Precinct No. One voters were in new Precinct No. Four. They were represented by a County Commissioner who was elected by the voters in former Precinct No. Four. He didn't live in their part of the county and they may not have known him at all. Certainly, they didn't vote for him. And, what is more fateful, they'll not have an opportunity to vote for one of their neighbors for the office of County Commissioner until 1974. After the general election of that year, everyone in the county will be presented by some-

one from their area, even if the winner isn't their preferred candidate.

But, what about the meantime? By comparing the new precinct map with the old one, it appears to the Court that the citizens of the old Precinct No. One, now residing in new Precinct No. Four, may have been the victims of some rather fancy political footwork. However, such conjecture is probably not of consequence in face of the stipulation of good faith filed herein. But, regardless, would it be such a monstrous injury that the Federal Courts ought to remedy it?

■ In our zeal to administer justice, we must not forget that Federal Courts derive the power to rearrange state elections only when the Constitution requires such action and not because of "fairness" or the "equities." See footnote 2, page 157, Carr v. Brazoria County, Texas, 341 F.Supp. 155 (D.C.Tex. 1972). However, this does not mean that the Court, after determining the existence of a constitutional violation, must disregard general equitable principles with respect to the timing of relief. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). We'll discuss the consequences of the relief prayed for later on.

The Texas constitutional amendments and the statutes enacted, with regard to staggered terms and the redistricting of commissioner precincts for the purpose of maintaining the weight of every man's vote at a reasonable level, are not here attacked as being in violation of the Federal Constitution. Plaintiffs admitted this during the hearing held before the Court on October 5, 1972. There is no three-judge court question here.

It is true these Plaintiffs resentfully complain about the activities of their Commissioner's Court which resulted in the inequities above mentioned, and who can blame them? Whether the entire Commissioner's Court is still made up of the County Judge and the same four men elected in 1968, and the county affairs are carefully administered, is really immaterial. It was the action of the group acting as the Commissioner's Court which created the problem. That action, say these Plaintiffs, was arbitrary and capricious and violative of their rights under the Constitution of the United States. So, these Plaintiffs say this Court should require the present Commissioner of Precinct No. Four to stand for election within ninety (90) days, or he should submit his name to the electorate in the new Precinct No. Four at the general election this November 7th.

■ Before we pursue the constitutional issue further, we ought to deal with the man who was elected in 1970 as County Commissioner of Precinct No. Four. His name is Fidel Munoz. His election took place in the former Precinct No. Four after the redistricting plan had been approved, but before its effective date. He is still serving the four-year term to which he was elected, although his constituents are different people than those who elected him. Nonetheless, the arrival of January 1, 1971, and the resulting effectiveness of the redistricting plan did not divest Mr. Munoz of his job. The Court is aware that the Plaintiffs have refused to stipulate as to the legality of the elections to Commissioner posts for Precincts No. Four and No. Two in 1970. However, assuming the legality of his election, which we must do under the status quo, and barring any severe and unforeseen future circumstances, he will remain as Commissioner of Precinct No. Four for the balance of his term, that is, until January 1, 1974. Childress County, Texas v. Sachse, Tex.Civ.App., 310 S.W. 2d 414 (1958). The holding in this Texas case may not fit the Federal approach to matters such as we have here, but this Court has no desire to sit in judgment on a Texas Court of Civil Appeals. Further, it seems to the Court that Munoz, by virtue of his election under the circumstances above referred to, did not lose any of his constitutional rights, nor did he deprive anyone else of their rights. He was not a member of the

Commissioner's Court when the redistricting orders were passed and is not a culprit here. So, we'll follow *Sachse.*

■ We conclude there are no vacancies on the Zapata County Commissioner's Court at this time. Perhaps the Commissioner's office held by Munoz is subject to being declared vacant by a proper tribunal; but, the legality of his election or his right to the office today should be determined by a Texas state court in a different kind of lawsuit. For this Court to call an election for the post of County Commisisioner No. Four now is not the answer. To do so would be, at this juncture, an expensive exercise in confusion. There are no facts to indicate the incumbent could be removed from office under the applicable state statutes, and until a vacancy is established by a final court decree, what official action could be taken, in event someone else would successfully pursue the office? Two men sitting in the same chair would accomplish nothing. And, this Court is convinced whether Munoz was or was not legally elected presents no Federal constitutional question. Obviously, he is not seeking an answer.

While the constitutionality of Article 2351½(a), Vernon's Ann.Texas Civil Statutes, under either the Federal or state constitutions, is not here attacked, Plaintiffs do complain in their briefs filed that no respect was paid to it, and particularly that portion which reads:

> "If an election for *any* precinct office is held before the effective date of the order, the office shall be filled at the election *by the voters of the precinct as it will exist on the effective date of the change in boundaries.*" (Emphasis supplied.)

They say this controversy arose because the full Commissioner's Court did not, in the 1970 general election, comply with the quoted provision of the Act. But, there is certainly a question about that. This statutory provision, when read with the rest of the statute, appears to relate to County Commissioner precincts, but it may not. The full text of the statute is subject to various interpretations. The Attorney General of Texas has opined the statute, in some respects, violates the Constitution of the State of Texas. Thus, it is hardly this Court's business to determine the constitutional validity of Article 2351½(a). Reetz, Commissioner of Fish and Game of Alaska et. al. v. Bozanich et al., 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970).

But, assuming that county governing body misinterpreted the above quoted provision of Article 2351½(a) and failed to follow it properly, we would not alter, because of such error, our previous conclusion that no vacancies exist on the Commissioner's Court. Probably the most technical job of any Commissioner's Court is borrowing money for county improvements; municipal bond and bank attorneys are cautious people. The county may already be in trouble in this regard should a bond issue be important, but there is no indication in this record that the Zapata County Commissioner's Court is unable to make purchases or pay bills. There is no need for this Court to further muddy the waters.

Again making another assumption, suppose the final court decision would say that the commissioner for each precinct should have been elected by the "voters of the precinct as it will exist on the effective date of the change in boundaries," that is, as of January 1, 1971. What then? The redistricting complained of took place after the Democratic primaries were held in Zapata County. The Democratic Party candidates had been chosen, and they were entitled to have their names on the general election ballot. The election for the office of Commissioner of Precinct No. Four had already commenced. Thus, it is arguable that the quoted provision of the statute was not applicable. We conclude that the Democratic primary and here and there a Republican primary may very well be a part of a two-step election process. If the Texas courts would follow the holding in Rice v. Elmore, 165 F.2d 387 (4th Cir. 1947), the

redistricting order passed by the Zapata County Commissioners in August, 1970, would have been passed subsequent to the time the election process commenced. Under such theory, there would not have been, on the date of the primary, an "effective date of the change of boundaries," as is provided in the statute. What Federal question would be decided in determining an answer to such problem? We think none serious enough for this Court to exercise the authority which the state courts have to construe and apply Texas statutes.

In order for Plaintiffs to have the relief they are here demanding, that is, to vote for the office of County Commissioner of Precinct No. Four right now or shortly thereafter, there must be another election soon. It is too late to submit that office on the ballot for this year's general election, but, practically, a special election could be held before the end of this year. Although such a special election sounds simple enough, it is not. In effect, Plaintiffs are asking this Court to declare the election of Munoz to have been invalid at the inception, or that he has lost his right to the office someplace along the way, or that his term will expire on December 31, 1972. If any one of these questions should be answered by a state court favorably to Plaintiffs, there would be no Fourteenth Amendment violation to settle. An election would necessarily follow. It comes down to this: if under any circumstances, and regardless of how all the questions might be answered, there would still be a Fourteenth Amendment question to answer, we've already written too much. But, as we've pointed out before, we haven't been able to find such a question. Under Carr v. Brazoria County, supra, this is a proper case for abstention.

Before this Court sets out to determine what Article 2351½(a) really means, or decides the fate of the Commissioner of Precinct No. Four and of those voters of former Precinct No. One who did not vote for him or anyone else for that office in 1970, and will not in

1972, the Texas courts should have a chance. Harris v. Samuels, 440 F.2d 748 (5th Cir. 1971), cert. den. 404 U.S. 832, 92 S.Ct. 77, 30 L.Ed.2d 62.

It is, therefore, ordered, adjudged and decreed that this case is dismissed without prejudice to Plaintiffs' rights to proceed in the state courts for appropriate relief, and without prejudice to again enter this forum in the event, after exhaustion of efforts in the state courts, a Fourteenth Amendment question exists. This is a final judgment. The court costs will be paid by Zapata County, Texas. The Clerk shall furnish copies of this order to the appropriate counsel.