[Civ. No. 11260. Fourth Dist., Div. One. May 2, 1973.]

MICHAEL B. GRISWOLD et al., Plaintiffs and Respondents, v. COUNTY OF SAN DIEGO et al., Defendants and Appellants.

## COUNSEL

Robert G. Berrey, County Counsel, Joseph Kase, Jr., Assistant County Counsel, and Timothy K. Garfield, Deputy County Counsel, for Defendants and Appellants.

Ruffin & Whalen and Roger S. Ruffin for Plaintiffs and Respondents.

## OPINION

**AULT, J.**—This dispute concerns the validity of an ordinance adopted by San Diego County's Board of Supervisors redistricting the county's five supervisorial districts after the 1970 federal census. The trial court held the ordinance invalid. The county and certain of its officers named in the action have appealed.

## THE ORDINANCE

On October 5, 1971, the Board of Supervisors of San Diego County adopted Ordinance No. 3767 (New Series), which distributed the population of San Diego County, according to the 1970 census, among the five supervisorial districts as follows:

| Dist. No. | Population | % of County Population within Dist. | City Population | % of City Population within Dist. |
|---|---|---|---|---|
| 1 | 272,163 | 20.0% | 91,771 | 13.2% |
| 2 | 271,518 | 20.0% | 43,732 | 6.3% |
| 3 | 271,629 | 20.0% | 270,894 | 38.8% |
| 4 | 270,127 | 19.9% | 265,247 | 38.1% |
| 5 | 272,417 | 20.1% | 25,125 | 3.6% |
| Totals | 1,357,854 | 100.0% | 696,769 | 100.0% |

The plan created three "outer districts" (Districts 1, 2 and 5) consisting of the south, east and north county areas, and two "inner districts" (Districts 3 and 4) made up principally of the City of San Diego. Each district, however, contained portions of the City of San Diego.

Supervisors in San Diego County are elected for four-year terms on a staggered basis. Under preexisting law, elections were scheduled in Districts 1, 2 and 3 in 1972, and for Districts 4 and 5 in 1974. As a result of redistricting, some voters were placed in districts which would hold an election two years earlier than their previous districts, while others had their vote for supervisor delayed two years.

## STATEMENT OF THE CASE

On November 2, 1971, plaintiffs Michael and Betty Griswold filed a petition for writ of mandate and complaint for declaratory relief challenging Ordinance No. 3767 (New Series). An amended petition was filed on November 29, 1971 (a further amendment to the petition was filed December 8, 1971, after hearings were commenced, adding Margaret Knobloch as a party plaintiff). The amended petition, in addition to challenging the validity of the ordinance, sought a writ of mandate ordering the district attorney, assessor and the county clerk to constitute themselves as a redistricting commission to redistrict the supervisorial districts of the county, and ordering the registrar of voters and the county clerk to refrain from recognizing the ordinance.

The parties waived issuance of an alternative writ and hearings commenced in the superior court on December 13, 1971. Approximately a dozen witnesses testified during the hearings, and more than 75 documents were introduced into evidence. At the conclusion of plaintiffs' case, defendants moved for judgment under Code of Civil Procedure section 631.8, but the court declined to enter judgment until the close of all evidence. On December 30, the court held the redistricting ordinance invalid and granted a peremptory writ of mandate. Findings of fact and conclusions of law were signed January 10, 1972; judgment was signed the following day.

The judgment (1) declared the redistricting ordinance invalid, (2) ordered a peremptory writ of mandate to issue commanding the registrar of voters to refrain from acting on Ordinance No. 3767 (New Series) until such time as the board of supervisors redistricted the county in accordance with the judgment and the board of supervisors to reapportion and redistrict the county in accordance with the court's requirements, and (3) dismissed the action as it related to the formation of the redistricting commission to reapportion and redistrict the county.

The appeal filed by the defendants stayed enforcement of the superior court judgment. This court denied plaintiffs' application for a writ of mandate to require enforcement of the judgment pending appeal. The 1972 elections were held in San Diego County in districts created by the 1971 ordinance.

The county's principal contentions on appeal are directed at the trial court's conclusion the redistricting ordinance violates the equal protection clause of the United States Constitution and Section 5 of the San Diego County Charter.

DISCUSSION

## I. DOES THE REDISTRICTING ORDINANCE VIOLATE THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT?

 While the equal protection clause of the Fourteenth Amendment permits greater flexibility in state (and thus local) legislative reapportionment statutes than in those governing congressional reapportionment, it requires that state (and thus local governmental units) be apportioned *substantially* on an equal basis for the purpose of electing legislative representatives. (*Reynolds* v. *Sims,* 377 U.S. 533, 578-579 [12 L.Ed.2d 506, 536-537, 84 S.Ct. 1362, 1390]; *Mahan* v. *Howell,* 410 U.S. 315, 321 [35 L.Ed.2d 320, 328, 93 S.Ct. 979, 983].) The "overriding objective"

of any such statute "must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen" in the governmental unit involved. (*Reynolds* v. *Sims, supra,* 377 U.S. 533, 579 [12 L.Ed.2d 506, 537].)

Plaintiffs have not asserted, and the trial court did not find, that the ordinance under consideration does not achieve the basic equality demanded by the equal protection clause. Indeed, plaintiffs concede on appeal such equality was probably achieved to a degree more exacting than the most stringent requirements of any reapportionment decisions of either the California or the United States Supreme Court.

The equal protection attack on the ordinance centers upon the claim the redistricting effected by it shifted too many citizens from one district to another, which, when superimposed upon the fact the five county supervisors are elected for staggered terms, deferred the right of a substantial number of citizens to vote for supervisor for two years. The trial court adopted this view, and in summary, found that the reapportionment plan adopted by the board of supervisors (Ord. No. 3767 [New Series]) substantially changed existing district boundaries, effected a greater shift of population from one district to another than was necessary to attain equal apportionment of population among the districts, and thus encroached upon the fundamental right to vote for supervisor at the next election of 40,000 voters. It also found that adoption of another plan before the board (Plan No. 2) would have achieved equality of population among the districts and deferred the right to vote of only 18,000 as opposed to 40,000 voters. It concluded the reapportionment ordinance debased and diluted the right to vote of 40,000 persons in violation of the equal protection clause of the Fourteenth Amendment in a manner not necessitated by any compelling state or county interests.

The equal protection argument advanced against the county reapportionment ordinance is a novel one, and we have not been cited to or found any reported state or federal decisions which have considered it.[1] Several factors lead us to conclude it should not prevail here.

As a practical matter the issue may well be moot. The 1972 supervisorial elections have already been held under the ordinance and the delay in

---

[1]*People* ex rel. *Snowball* v. *Pendegast,* 96 Cal. 289 [31 P. 103], decided in 1892, upheld the validity of a reapportionment plan in which substantial numbers of persons were transferred from one senatorial district to another so that many would be voting for representatives at a time later than they would have voted had they remained in their old districts. The decision did not, however, consider the equal protection argument.

voting has already been suffered. The claimed defect in the ordinance affects only the initial election held under it; future elections remain wholly unaffected by it. No new apportionment plan could reverse what has occurred, and, conversely, any new apportionment would cause many voters to have their right to vote for supervisor delayed an additional two years.

But even if the issue is not moot, the ordinance does not violate the equal protection clause. ▮ Apportionment is peculiarly a political function addressed to the legislative branch and involves matters not appropriate for courts to decide. Once the requirement of one-man-one-vote is met, courts should be reluctant to interfere in the process. (*Legislature* v. *Reinecke*, 6 Cal.3d 595, 598 [99 Cal.Rptr. 481, 492 P.2d 385]; *Silver* v. *Brown*, 63 Cal.2d 270, 280 [46 Cal.Rptr. 308, 405 P.2d 132].)

Whenever the constitutional requirement of reapportionment is superimposed upon a system in which representatives are elected for staggered terms, it inevitably follows from the fact district boundaries must be changed to achieve equality of population that the right of some voters to vote for representatives at the next election will be deferred. This result is demonstrated in the instant case by the trial court's finding that adoption of what plaintiffs delineate as the "minimum change plan" would have this effect upon 18,000 voters.

Plaintiffs assert reapportionment "touches upon or burdens the right to vote" where elections are staggered and urge that the equal protection clause imposes a minimum change requirement upon reapportionment. In effect they say the legislative body responsible for reapportionment must not only achieve equality of population by its reapportionment statute, but must achieve it in a manner involving the least possible shift in district lines: deviation from the minimum change requirement can only be justified by a showing of governmental necessity or a compelling state or county interest.

The rule urged on appeal and adopted by the trial court finds no support in the decided cases. Reliance upon decisions which hold malapportionment and the imposition of such voting requirements as payment of a poll tax, property ownership, or long duration of residency constitutionally impermissible is misplaced. Such a minimum change requirement would unduly restrict the legislative prerogative, presuppose that existing district alignments best serve the interests of the area, inhibit change, deemphasize the statutorily imposed consideration to be given such matters as topography, geography, cohesiveness, contiguity, integrity, compactness of territory, and community of interest (Gov. Code, § 25001), and apply an improper test to the equal protection requirement.

The evidence discloses the board of supervisors studied the matter of reapportioning the county for six months after the 1970 census figures became available. It held lengthy hearings and considered many different plans. The plan ultimately adopted divided the county into three outlying districts (the north, south and east county districts), and two metropolitan districts made up mainly of the City of San Diego. Besides accomplishing equality of population among the districts, the plan adopted had among its purposes:

(1) Uniting the City of El Cajon, the City of La Mesa, Lemon Grove, Spring Valley, Santee and Lakeside communities (the heartland area) into one district. These areas, all in the east county and geographically related, had previously been in three separate supervisorial districts.

(2) Uniting the Linda Vista area of San Diego into the same district and thus discontinuing the fragmentation of a minority community.

(3) Uniting the south bay cities of Chula Vista and National City into the same district. These neighboring cities had been previously divided into two districts, a subject of substantial community complaint.

Whatever criticism might be leveled against the county reapportionment ordinance, it was based upon a rational policy which the board could properly consider in making its determination. A plan, having as its purpose the alignment of the County of San Diego into reasonably compact geographical communities of interest made up of the north county (District 5), the east county (District 2), the south bay area (District 1) and two metropolitan districts (Districts 3 & 4), is based upon rational considerations. ■ A county reapportionment plan based upon rational considerations which achieves equality of population among the districts, corrects previously existing fragmentation of minority communities, and joins previously separated neighboring cities into a single district does not violate the equal protection requirement merely because it makes substantial changes in existing district lines and thus defers the right to vote for supervisor at the next election of more voters than some other plan.

No court has yet held the equal protection clause inhibits redistricting which merely postpones the right to vote or that it operates to require a minimum change above all other considerations involved in state or local reapportionment. If the clause has applicability under that circumstance, deviations from the minimum change requirement should be tested by whether the plan is based upon rational considerations and not by whether it is dictated by governmental necessity or compelling state or county interests. ■ As applied to state or county reapportionment statutes,

". . . the proper equal protection test is not framed in terms of 'governmental necessity,' but instead in terms of a claim that a State may 'rationally consider.' " (*Mahan* v. *Howell, supra,* 410 U.S. 315, 326 [35 L.Ed.2d 320, 331, 93 S.Ct. 979, 986]; see also *Reynolds* v. *Sims, supra,* 377 U.S. 533, 580-581 [12 L.Ed.2d 506, 538-539, 84 S.Ct. 1362, 1391].) The ordinance under consideration is "rationally" based and meets this test. (See *Salyer Land Co.* v. *Tulare Water District,* 410 U.S. 719, 734-735 [35 L.Ed.2d 659, 670, 93 S.Ct. 1224, 1233].)

## II. DOES THE REDISTRICTING ORDINANCE VIOLATE SECTION 5 OF THE SAN DIEGO COUNTY CHARTER?

Consideration of this issue requires a brief discussion of the historical background of the charter provision. Section 5 of the San Diego Charter originally provided:

"The Board of Supervisors may hereafter change the boundaries of any Supervisor[ial] District as provided by the laws of the State of California and if they shall hereafter so change such boundaries, then to the extent that population will permit, at least two (2) of such districts shall comprise areas outside of the City of San Diego, the population of which areas shall, as nearly as possible, be divided equally between such two (2) districts." (Cal. Stats. 1933, res. ch. 10, p. 2817.)

This provision was adopted in 1933 when 70 percent of the county's population resided in the City of San Diego. By requiring equal division of noncity population into two districts, section 5 created two districts which would not be controlled by the City of San Diego.

As the population of the county increased, the percentage residing within the city diminished until, by 1962, it was less than 60 percent. To maintain districts of equal population, it was necessary to put some noncity population into more than two districts, but this would have conflicted with the provisions of section 5 of the charter. Additionally, the city had annexed the areas of San Ysidro, Otay and Nestor, bypassing the intervening cities of Chula Vista and National City by use of a narrow corridor through the San Diego Bay. To follow the dictates of section 5, it would have been necessary to remove this area from one of the "outer districts" and place it into what would be a noncontiguous city district. This problem was also presented by the city's annexation of noncontiguous reservoir areas.

To deal with these problems, section 5 of the charter was amended by the voters in 1963 to provide:

"The Board of Supervisors may hereafter, and shall after each Federal

decennial census, change the boundaries of the Supervisorial Districts in accordance with the laws of the State of California and this Charter. In making any such change the Board of Supervisors shall so divide the total area of the County that, to the extent that population will permit, at least two of such districts shall comprise areas outside of the City of San Diego except for such small portions of that city as may be included in giving consideration to the factors authorized by general law . . . ." (Cal. Stats. 1963, res. ch. 10, p. 4657.)

Bertram McLees, who was county counsel at the time and who authored the amendment, testified at the superior court trial. He stated it was his and the board's intention that at least two districts remain substantially outside the city, but for small portions which could be included for reasons outlined in state law. The allowable deviations were those contained in Government Code section 25001.[2] His testimony conformed to the ballot analysis presented to the voters when they approved the amendment.

Under the ordinance adopted by the board of supervisors, Districts 2 and 5 were designed to meet the requirements of section 5 of the county charter. Of the city's population, 6.3 percent was placed in District 2 and 3.6 percent in District 5. The board made an express finding of compliance with both the charter and the provisions of Government Code section 25001. Section 1 of Ordinance No. 3767 (New Series) reads as follows: "Pursuant to Section 5 of the San Diego County Charter and Sections 25001 and 25001.1 of the Government Code, and after giving consideration to the applicable decisions of the courts, the factors enumerated in said Section 25001 and the provisions of said Charter, the Board of Supervisors of the County of San Diego hereby adjusts and redefines the boundaries of the supervisorial districts of the County of San Diego as hereinafter set forth in this ordinance."

█ Despite the board's contrary finding, the trial court concluded the ordinance was invalid because it violated section 5 of the county charter. It found each of the districts (including Districts 2 and 5) contained substantial, not small, portions of the population of the City of San Diego, and that the board did not give consideration to the factors authorized by general law (i.e., those enumerated in Gov. Code, § 25001).

Because reapportionment is so essentially a legislative function, certain basic considerations relating to the fundamental doctrine of the separation

---

[2]Government Code section 25001 states in part: "In establishing the boundaries of the districts the board may give consideration to the following factors: (a) topography, (b) geography, (c) cohesiveness, contiguity, integrity, and compactness of territory, and (d) community of interests of the districts."

of powers between the judicial and the legislative branches of government regulate and limit courts in the exercise of their power to declare such enactments invalid. In passing upon the validity of a legislative enactment, courts "exercise an extraordinary power over a coordinate branch of government and perform a correspondingly narrow function. . . ." (*Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control,* 65 Cal.2d 349, 359 [55 Cal.Rptr. 23, 420 P.2d 735].) Among the limitations upon the court's power is the presumption the enactment is valid and that the legislative body performed its duty and ascertained the existence of any facts upon which its right to act depended. (*Galeener* v. *Honeycutt,* 173 Cal. 100, 104 [159 P. 595]; *Robins* v. *County of Los Angeles,* 248 Cal.App.2d 1, 6 [56 Cal.Rptr. 853].) Courts will not declare such enactments invalid unless it appears the action taken was arbitrary, capricious or entirely lacking in evidentiary support (*Schenley Affiliated Brands Corp.* v. *Kirby,* 21 Cal.App.3d 177, 196 [98 Cal.Rptr. 609]). A court may not substitute its judgment for that of the legislative body merely because it doubts the wisdom of the action taken (*Faulkner* v. *Cal. Toll Bridge Authority,* 40 Cal.2d 317, 329 [253 P.2d 659]), and must sustain the legislative enactment if there is any reasonable basis for it (*Rible* v. *Hughes,* 24 Cal.2d 437, 445 [150 P.2d 455, 154 A.L.R. 137]). (Also see generally, *In re Herrera,* 23 Cal.2d 206, 212 [143 P.2d 345]; *Acton* v. *Henderson,* 150 Cal.App.2d 1, 19 [309 P.2d 481]; 6 McQuillin, Municipal Corporations (1969 rev. ed.) § 20.01 et seq.)

■ The court did not find the board acted arbitrarily or capriciously in adopting the redistricting ordinance, and nothing in the record would support such a finding. As a matter of judgment, reasonable minds might differ as to whether the 3.6 percent and the 6.3 percent of the city's population assigned to Districts 5 and 2 constituted "small portions" of the population of the City of San Diego, within the meaning of section 5 of the county charter, but that fact did not permit the court to substitute its judgment for that of the board under the well established principles stated above. The same impermissible substitution of judgment is apparent in the court's findings relating to the conclusion the board did not give consideration to the factors enumerated in Government Code section 25001.[3] A mere reading of Finding No. 14 indicates the court engaged

---

[3]Finding No. 14 reads as follows: "Each of the said supervisorial districts as defined by Ordinance No. 3767 (New Series) contains substantial portions of the population of the City of San Diego, and none of said districts contains a small portion of the City of San Diego or small portion of the population thereof. The Board of Supervisors of the County of San Diego in enacting Ordinance 3767 (New Series) did not give consideration to the factors authorized by general law, specifically the factors enumerated in Government Code § 25001 in dividing the County of San Diego

in a weighing process rather than limiting its determination to whether there was a reasonable basis for the board's action. The record, including the recitation in the ordinance itself, shows the board did give consideration to the factors enumerated in the Government Code and the provisions of the county charter in making its determination.

Consideration of such factors as topography, geography, contiguity and the existence of communities of interest, and the weight to be given them in establishing political districts, are matters directed primarily to the legislative branch for determination. When such determinations have been made by the legislative body, courts should not interfere except upon a showing of manifest abuse. No such showing was made in this case.

What we have said requires a reversal of the judgment and makes it unnecessary to discuss the county's other contentions.

The judgment is reversed and the case is remanded to the trial court with instructions to enter a judgment denying the writ.

Brown (Gerald), P. J., and Whelan, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied June 28, 1973.

---

into five districts, nor in defining the boundaries of any districts thereof, either at all or in assigning portions of the City of San Diego to Districts 2 and 5; that in particular that while there is some community of interests between Subregional Area 12 (University) and the remainder of Supervisorial District No. 5 as defined by Ordinance No. 3767 (New Series), there is more community of interests between said University subregional area with the neighboring suburbs of the City of San Diego to wit, the La Jolla area and the Clairemont area; there is a greater community of interests between the San Carlos-Lake Murray (census tract no. 96.02, 97.01, 97.02, 98.01, 98.02 and 98.03) portion of the Elliott-Navajo subregional area (all of which are inside the boundaries of the City of San Diego) with the rest of the City of San Diego, than there is with the remainder of Supervisorial District No. 2 as so defined; there is more community of interests between Subregional Area No. 2 (Peninsula), being a portion of the City of San Diego, with neighboring portions of the City of San Diego, than with the remainder of Supervisorial District No. 1; there is little or no community of interests between Census Tract No. 170.03 and District No. 3; that said last mentioned census tract has been further split in two and a portion of the same, being a suburb of the Poway area, is separated by district lines from the rest of the Poway area in District No. 5. The University Subregional Area No. 12 comprises population numbering approximately 13,000 now in District No. 5, and the San Carlos-Lake Murray area in District No. 2 comprises population numbering about 40,000."