414 So.2d 1040 (1982)
In re APPORTIONMENT LAW APPEARING AS SENATE JOINT RESOLUTION 1 E, 1982 SPECIAL APPORTIONMENT SESSION; CONSTITUTIONALITY VEL NON.
No. 61933.
Supreme Court of Florida.
April 26, 1982.
On the Merits May 12, 1982.
*1042 Jim Smith, Atty. Gen., Kendrick Tucker, Deputy Atty. Gen., and Mitchell D. Franks and Gerald B. Curington, Asst. Attys. Gen., Tallahassee, for Atty. Gen. of the State of Fla., petitioner.
Thomas W. McAliley of Beckham & McAliley, Miami, and Neal P. Rutledge, Washington, D.C., for the Florida Senate; Barry Richard of Roberts, Baggett, LaFace, Richard & Wiser, Tallahassee, and Mark Herron, House Select Committee on Reapportionment, Tallahassee, for Florida House of Representatives, respondents.
Talbot D'Alemberte, L. Martin Reeder, Jr. and Thomas R. Julin of Steel, Hector & Davis, Miami, for Republican Legislators.
Gerald B. Cope, Jr. of Arky, Freed, Stearns, Watson & Greer, and Stephen T. Maher, Miami, for Common Cause/Florida.
Tom R. Moore, in pro. per.
Joseph W. Little, University of Florida, College of Law, Gainesville, for Manning J. Dauer, Emeritus Professor of Political Science, University of Florida, and Joseph W. Little, Professor of Law, University of Florida, amici curiae.
Chesterfield Smith and Jacqueline Allee of Holland & Knight, Tampa, and Ruth Ann Bramson, in pro. per., as President of The League of Women Voters of Florida, Tampa, for The League of Women Voters of Florida.
Tony Cunningham of Wagner, Cunningham, Vaughn & McLaughlin, Tampa, for Honorable Pat Frank, Senator, District 23 Florida Senate, amicus curiae.
Michael L. Rosen of Holland & Knight, Tallahassee, and Paul B. Steinberg, in pro. per., of Steinberg & Wohl, Miami Beach, for Honorable Paul B. Steinberg, Senator, District 36 Florida Senate.
John M. Diaz, in pro. per.
Halley B. Lewis, in pro. per.
Donald A. Dowdell, General Counsel, Dept. of Insurance, Tallahassee, for Treasurer and Insurance Commissioner of the State of Florida.
C. Allen Watts, Deland, for William E. Keller, et al., individually and as constituting the West Volusia Legislative Appeals Committee.
Heyward A. Bradman, Miami, for Political Coalition of South Dade.
Cynthia S. Tunnicliff of MacFarlane, Ferguson, Allison & Kelly, Tallahassee, for Robert Altobello and Richard Basringer, residents of City of Miramar, Broward County, Florida.
PER CURIAM.
This Court directed the attorney general and all interested parties to present briefs and oral argument upon the issue raised by the attorney general
that [Senate Joint Resolution] 1 E may not constitute a joint resolution of apportionment because although the Legislature in SJR 1 E did agree as to the number and location of the constitutionally required House and Senate districts, the House and the Senate apparently did not agree concerning the separate requirement for consecutively numbered districts.
In response, the Florida Senate and the Florida House of Representatives entered into a stipulation, which they filed in this cause, stating:
1. On April 7, 1982, both the Florida Senate and the Florida House of Representatives duly passed SJR 1 E including the numbering of Senate districts as shown in Section 3 of the Resolution.
2. The language included in subsection 5(2) of SJR 1 E was intended solely to preserve the right of the House of Representatives to challenge in this Court the constitutional validity of the number pattern.
*1043 In argument before this Court, counsel for the House explains that it voted for adoption of the particular designation of senate districts contained in SJR 1 E but that it reserves the right by its policy statement in the joint resolution to question the validity of the numbering scheme. The House asserts the reason for the qualifying language in SJR 1 E was to serve notice that the House would raise the constitutional issue and to prevent any argument being made that it was estopped from presenting that issue before this Court.
We conclude that SJR 1 E is not invalidated because policy language was inserted to protect the House in its desire to contest a portion of the resolution's constitutionality. The resolution reflects that the House properly adopted the senate numbering plan in issue. Applying accepted principles of statutory construction, we find that SJR 1 E constitutes a joint resolution of apportionment within the purview of article III, section 16(a), Florida Constitution. See State v. Webb, 398 So.2d 820 (Fla. 1981); Wakulla County v. Davis, 395 So.2d 540 (Fla. 1981); Sharer v. Hotel Corp. of America, 144 So.2d 813 (Fla. 1962); State ex rel. Church v. Yeats, 74 Fla. 509, 77 So. 262 (Fla. 1917). By our action, we have not addressed the merits of the validity of the senate district numbering or the senate terms of office, and leave those and any other issues that may be raised concerning the joint resolution's validity to our consideration on the merits in accordance with the procedure previously established. The time for submission of briefs and oral argument will remain as set in our prior orders.
It is so ordered.
SUNDBERG, C.J., and ADKINS, BOYD, OVERTON, ALDERMAN and McDONALD, JJ., concur.
EHRLICH, J., dissents.

ON THE MERITS
OVERTON, Justice.
This is an original proceeding in which the attorney general petitions this Court for a declaratory judgment under article III, section 16(c), Florida Constitution, to determine the validity of Senate Joint Resolution 1 E apportioning the legislature of the State of Florida.[1]
*1044 The attorney general filed this petition for review of the apportionment plan on April 12, 1982, and this Court invited all interested parties to submit briefs in support of or opposition to the plan and to participate in oral argument before the Court. With the exception of three objections to individual house districts identified in this opinion, there is complete support for the geographic single-member districts established by the apportionment plan. The plan passed by the senate and the house on April 7, 1982, during a special apportionment session called by the governor pursuant to article III, section 16(a), is a substantial achievement in voting equality. The districts established by the plan are extremely close to exact population equality. The population of the state, as established by the Bureau of the Census, is 9,746,324.
The ideal senate district contains 243,658 people [the state population divided by forty districts]. The largest senate district is district 35 with a population of 244,945, which is a deviation from the ideal of 1,287 people or .53 percent. The smallest senate district is district 22 with a population of 242,379, which is a deviation from the ideal of 1,279 people or.52 percent. For the senate, this results in a total deviation from the ideal of 2,566 people or 1.05 percent between the smallest and the largest senate districts.
The ideal house district contains 81,219 people [population of the state divided by 120 districts]. The largest house district is district 8 with a population of 81,392, which is a deviation from the ideal of 173 people or .21 percent. The smallest house district is district 10 with a population of 81,014, *1045 which is a deviation from the ideal of 205 people or .25 percent. The total deviation between the largest and smallest house districts is, therefore, 378 people, or a .46 percent deviation. The attorney general submits that the special needs of minority voters were recognized, illustrated by the fact that the plan includes seven house districts with a Hispanic population of fifty-eight percent or higher; seven house districts with a black population of fifty-two percent or higher; one senate district with a black population of sixty-five percent; and two senate districts with a Hispanic population of fifty-five percent or higher.
The plan for senate districts also maintains the integrity of forty-four counties, and house districts do so with twenty-six counties. In most instances, county lines have been split principally because population was greater than the ideal number of people per district.
The Republican members of the house, Common Cause, and the League of Women Voters have all submitted briefs in support of the geographic districts established by this plan.
The adversary issues presented for our determination are: (1) whether the senators elected in 1980 from odd-numbered districts should continue in office until 1984; (2) whether the territory within each district must be contiguous and each district must be contiguous with the next consecutively numbered district; (3) the claim by certain residents of house district 27 that portions of that proposed house district are connected only by a corridor of I-4, which is not a sufficient connection to be contiguous within the meaning of the constitution; (4) the claim that district 112 has been gerrymandered to the detriment of the Hispanic population of Dade County, and the claim that districts 117, 118, and 119 in Dade County should be redrawn to provide a larger black concentration in one of those districts.
This Court has jurisdiction to resolve all issues by declaratory judgment arising under article III, section 16(c), Florida Constitution. We agree with the attorney general that the issue of whether all senators have to stand for election in 1982, although not indispensable for inclusion in a joint resolution of apportionment, is an important dependent matter and is a proper subject for disposition by this court in an article III, section 16(c) declaratory judgment proceeding. We find that we should answer the question because our determination requires no fact-finding and will avoid multiple litigation.
Before turning to the issues which have been contested before us, we point out that we have reviewed the entire record and find that the apportionment plan clearly meets the "one-man one-vote" and equal protection requirements of the Fourteenth Amendment to the United States Constitution. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). See Connor v. Finch, 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977); Chapman v. Meier, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975); White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); Gaffney v. Cummings, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973).
In summary, we hold that (1) since the geographic boundaries of all senate districts have been changed by this apportionment plan then elections must be held in 1982 for all senate districts; (2) the term "contiguous," as used in the constitution, means only that each district must be contiguous within itself; (3) district 27 is sufficiently connected by a corridor to meet the definition of "contiguous" within the meaning of our constitution; (4) the apportionment plan is valid on its face, and the objections to districts 112, 117, 118, and 119 are without merit, no showing having been made in this proceeding that there was any intentional discriminatory practice in the adoption of the plan.

PART I

Holdover Senate Terms
The major contested issue submitted in this apportionment proceeding is whether the Florida Constitution or the equal protection *1046 clause of the United States Constitution requires elections to be held in all senate districts in 1982, or whether the senators elected in 1980 from odd-numbered districts for four-year terms hold over until 1984.
The principal provisions of the Florida Constitution that must be construed are article III, section 1, and article III, section 15(a). Section 1 of article III provides:
SECTION 1. Composition.  The legislative power of the state shall be vested in a legislature of the State of Florida, consisting of a senate composed of one senator elected from each senatorial district and a house of representatives composed of one member elected from each representative district.
(Emphasis supplied.) Section 15(a) of article III provides:
SECTION 15. Terms and qualifications of legislators. 
(a) SENATORS. Senators shall be elected for terms of four years, those from odd-numbered districts in the years the numbers of which are multiples of four and those from even-numbered districts in even-numbered years the numbers of which are not multiples of four; except, at the election next following a reapportionment, some senators shall be elected for terms of two years when necessary to maintain staggered terms.

(Emphasis supplied.)
At the outset, the senate accepts the view that the courts have both the power and the duty to truncate the terms of legislators elected from malapportioned districts which violate the "one-person one-vote" command of the equal protection clause, and that elected officials have no property rights to the office to which they have been elected. The Florida Senate claims no such rights in its argument before this Court. The senate does not, however, agree that our constitution requires truncated terms in the situation now before the Court or that the Fourteenth Amendment has in any way been violated by the holdover terms. The senate contends that the language of section 15(a) mandates four-year staggered terms for senators. The senate argues that the exception provision of section 15(a) should be used only when necessary to maintain staggered terms, illustrating that it was necessary in 1972 when all senators were elected in 1968 for four-year terms but that it is not necessary in 1982 when the system is operating in a staggered fashion. It alleges that the important purpose of the holdover staggered terms provided in section 15(a) is to ensure that the senate will be a continuing body with at least one-half of its members being experienced legislators.
The senate also contends that the use of the word "reapportionment" in article III, section 15(a), as contrasted with the use of the word "apportion" or "apportionment" in article III, section 16, has considerable significance. It argues that the term "reapportionment" means the exception provision applies only when a constitutional amendment changes the composition of the senate or when reapportionment is mandated by a court order. We reject the argument of the senate that the word "apportionment," as used in the constitution, means apportionment by the legislature, and the word "reapportionment," as used in the exception phrase of section 15(a), applies only when there is apportionment by a court. We find the terms "reapportionment" and "apportionment" to have been used in section 15 and in section 16 interchangeably, and conclude that there was no intent to apply a different meaning to each of these words. We note that both "reapportionment" and "apportionment" are used without any intent to distinguish the terms in section 16(f) of article III. In addition, the legislature previously used the terms interchangeably in the 1965 reapportionment plan. See H.B. 19-XX, Florida Legislative Special Session (1965).
The attorney general agrees with the senate that the exception provision of section 15(a) is not applicable to any of the twenty senators elected in 1980, but concedes that the exception provision would apply if a senate district were changed by more than fifty percent, in addition to five other circumstances *1047 not in issue in this proceeding.[2] In oral argument, the senate also conceded that the exception provision of section 15(a) would apply on equal protection grounds if the composition of the district of a holdover senator had been changed by more than fifty percent.
The principal argument by the senate and the attorney general is that case law in other jurisdictions supports as justifiable, under the equal protection clause, a delay in the implementation of reapportionment to maintain an established state public policy expressed by statute or constitution that there be staggered terms for continuity in the legislative body. See Mader v. Crowell, 498 F. Supp. 226 (M.D.Tenn. 1980) (staggered terms by Tenn.Const., art. II, § 3); Ferrell v. Oklahoma ex rel. Hall, 339 F. Supp. 73 (W.D.Okla.), aff'd, 406 U.S. 939, 92 S.Ct. 2045, 32 L.Ed.2d 328 (1972) (staggered terms by Okla.Const.art. 5, § 9A); Legislature of the State of California v. Reinecke, 10 Cal.3d 396, 110 Cal. Rptr. 718, 516 P.2d 6 (1973) (staggered terms by Cal.Gov.Code § 9002 (Deering 1973)); Twilley v. Stabler, 290 A.2d 636 (Del. 1972) (staggered terms by Del. Code Ann.Tit. 29, § 808 (1974)).[3] In some jurisdictions, the establishment of staggered terms was by a constitutional provision, while in other jurisdictions, the provision for staggered terms was established by statute. We disagree with the views of the senate and the attorney general because in none of these cases did the constitution or the statute have anything similar to the exception language provided in section 15(a).
We hold, consistent with the views of the house of representatives and Common Cause, that the Florida Constitution, by its provisions, requires, upon reapportionment, that senate terms be truncated *1048 when a geographic change in district lines results in a change in the district's constituency. Because the new plan alters all district lines and the constituency therein, elections must be held in all senate districts in 1982. We reject the view of the League of Women Voters that terms always terminate with a new apportionment plan even if district lines are unchanged. Our holding results from a reasonable, rational construction of the words of the Florida Constitution and is supported by the history of apportionment in this state.
Our reasoning to support this holding requires not only an interpretation of the words of the constitution but also a review of the history of our apportionment process during the last twenty-seven years. In construing this exception provision of our constitution, we may look at the purpose of the provision, the evil sought to be remedied, and the circumstances leading to its inclusion in our constitutional document in order that "light may be obtained `from contemporary facts or expositions; from antecedent mischiefs, from known habits, manners and institutions; and from other sources almost innumerable, which may justly affect the judgment in drawing a fit conclusion in the particular case.'" State ex rel. West v. Gray, 74 So.2d 114, 116 (Fla. 1954). The history shows why this exception provision was placed in section 15(a) of our constitution.
The 1968 constitutional provisions pertaining to apportionment were drafted by a judicially-apportioned legislature, Swann v. Adams, 263 F. Supp. 225 (S.D.Fla. 1967), after a tortuous twelve-year reapportionment process, which commenced in 1955. From the years 1955 through 1966, no fewer than seven apportionment plans were formulated by the state legislature, all of which were determined eventually to be invalid by the federal judiciary. There was constant apportionment litigation beginning in 1962 with the Swann v. Adams series of cases.[4]
In 1967, after rejecting the plan submitted by the state legislature, the U.S. District Court imposed judicial apportionment and provided for March, 1967, elections. It was this legislature which added the exception language to section 15(a) in August, 1967, and approved the proposed Florida Constitution at its special session in July, 1968, for presentation and eventual adoption by the people in November, 1968, including the exception provision in issue in this proceeding.[5] Journal of the Senate, Regular Session 1967, at 2; Journal of the Senate, Special Session June 24, 1968  July 3, 1968, at 2; Journal of the House of Representatives, Regular Session 1967, at 2; Journal of the House of Representatives, Extraordinary Session June 24, 1968  July 3, 1968, at 2. As this history demonstrates, the multiple, time-consuming problems of apportionment litigation were fresh in the minds of the legislators who created this provision.
Although this new constitution provided for staggered terms and in part established the principle of continuity in office, this same legislature, by chapter 67-479, section 6, Laws of Florida (codified as section 10.011(2), Florida Statutes (1967)), provided *1049 that all senators would run in November of 1968 and their terms would all terminate together after the November, 1972, elections. The schedule adopted with the new constitution directed that "the requirements of staggered terms ... would apply only to senators elected in November of 1972, and thereafter," art. XII, § 12, Fla. Const. (1968), and the analysis by the Legislative Reference Bureau pertaining to that schedule provision, submitted to the people, says that this "[p]ostpones staggering of senators' terms until the general election of 1972, which would be in accordance with a reapportionment based on the 1970 census." Florida Legislature, Draft of Proposed 1968 Constitution, July 20, 1968, at 22: Florida State Archives, RG005, Series 725, Box 1, file 19. In our view, the framers of the constitution were not as concerned with continuity in office as with making sure that there would be a fair apportionment plan established by the legislature, approved by the Florida Supreme Court, and implemented as soon as possible to avoid any future substantial reapportionment litigation in the federal court system. In our view, the exception provision was intended as a means to implement a fair reapportionment plan at the earliest possible date.
Backed by the history, the language of the exception clause, in our opinion, clearly and unambiguously refers to elections following reapportionment of the Florida Legislature. We find that, although the first portion of section 15(a) of article III provides for staggered terms of four years for senators, the exception clause in the last sentence clearly allows for the truncating of the four-year terms of office following each reapportionment of the legislature as necessary to implement the new reapportionment plan. The 1967 legislature was very familiar with truncated terms.
In oral argument, the question was asked whom the holdover senators would represent if they were allowed to continue in office until 1984. In the words of the attorney general, upon approval of this apportionment plan, each holdover senator would represent the electorate in his or her new district. Counsel for the senate also agreed that holdover senators would be representing the new districts. The new apportionment plan changes the geographic lines and constituencies of every senate district, and there have been substantial changes in boundaries brought about because of the political change from multi-member districts to single-member districts. The constituency of the existing single-member districts has been significantly altered. Whole counties have been shifted from one district to another district. Ten entire counties would, under the new plan, be represented by holdover senators in a different district.[6]
The principle that holdover senators represent the newly drawn geographic districts requires us to answer the question of how a senator elected from a former district apportioned in 1972 would meet the requirement of section 1, article III. That section mandates that the senate be "composed" of one senator "elected" from each senatorial district. Given this provision, it necessarily follows that, since none of the senate districts from which senators were elected in 1980 are preserved intact (because all senate districts have been changed by the new apportionment plan), no senators elected in 1980 were in fact elected from the senatorial district which they now propose they should represent. In our view, the senators could be deemed elected from those districts only if they had been elected from the specific districts set forth in the 1982 apportionment plan. By this, we mean that their specific districts, from which they were elected in 1980, had not been changed geographically by the 1982 plan. We do agree that when a senate district is carried forward with no geographic change in boundary lines, article III, section 1, is satisfied, and there is no need to implement the exception provision of section 15(a). On the other hand, where, *1050 as in the instant case, all senate districts have been changed, we conclude that our constitution requires all senators to stand for election in order to be "elected from" the new districts.
We feel it is important to note that, not only were all the districts geographically changed, there was also a basic political change. The 1972 apportionment plan was composed almost entirely of multi-member senate districts, while the 1982 apportionment plan, submitted for our approval, is composed entirely of single-member senate districts. This is a major political change that substantially affects the political process. This type of major political change was not involved or a factor in the equal protection cases cited by the senate and the attorney general to justify holdover terms to maintain continuity in office as a justifiable temporary delay in reapportionment implementation. Although our decision is not based on Fourteenth Amendment equal protection grounds, this political change could be a significant distinguishing, and even controlling, factor.
In summary, we conclude that section 1 of article III mandates that senators be elected from the districts they represent, and, although section 15(a) of article III provides for staggered terms of four years for senators, requiring elections at two-year intervals, the clause in the last sentence of section 15(a) provides expressly for the truncating of four-year terms of office following each reapportionment of the legislature as they are necessary to implement the new reapportionment plan and to reinstate staggered terms during the ten-year apportionment period. We emphasize that we find that the use of the phrase "at the election next following reapportionment" clearly indicates that the terms of even or odd districts may be truncated following an apportionment when the geographic lines and constituencies of the district are changed. This provision, in our view, was intended to prevent delay in the implementation of reapportionment and negates the contention that there should be a delay in the implementation of apportionment for one-half the senate to allow continuity. In view of our construction of the Florida Constitution, we need not address Fourteenth Amendment equal protection arguments.

PART II

Must Each Senate District Be Adjacent to Each Other in Consecutive Order.
The second issue for our resolution concerns the construction of a portion of the language of article III, section 16(a), and whether, as written, that language requires each senate and house district to be both contiguous within itself and that each district must also be contiguous with the next consecutively-numbered district. The house of representatives, although it voted for the adoption of the particular designation of the senate districts contained in SJR 1 E, reserved the right in its policy statement in the joint resolution to question the validity of this numbering scheme. The house, in effect, is arguing that the numbered districts must be adjacent to each other in numerical order. The critical language of article III, section 16(a) that is in issue is as follows:
The legislature ... shall apportion the state in accordance with the constitution of the state and of the United States into not less than thirty nor more than forty consecutively numbered senatorial districts of either contiguous, overlapping or identical territory, and into not less than eighty nor more than one hundred twenty consecutively numbered representative districts of either contiguous, overlapping or identical territory.
(Emphasis supplied.) It is the position of the house that a distorted numbering pattern had developed under the constitution of 1885, and in its view it was probable, in an effort to avoid such distortions, that the phraseology "consecutively numbered senatorial districts of either contiguous, overlapping or identical territory" was placed in the present constitution. The house argues that the requirement for contiguous territory refers not only to the territory within each district, but to the relationship of the districts to each other, and must be read in *1051 pari materia with the requirement for consecutive numbering. It follows from this construction that each district for the house and for the senate must, therefore, be contiguous with the next consecutively numbered district. In the house's view, the purpose of the provision is to prohibit a distorted numbering which would serve the interest of individual senators or representatives.
It is the senate's position, supported by the attorney general, that the provision of article III, section 16(a), requires only that district numbers be consecutive and that the territory within each district be contiguous. They argue that a strict grammatical reading of the sentence in article III, section 16(a), supports the conclusion that the words "consecutively numbered" appear to modify the noun "districts," and the word "contiguous" modifies the noun "territory."
We agree with the senate and the attorney general that the plain language of article III, section 16(a), does not modify or limit the word "contiguous" or "territory." Even if the drafters had intended that each district be contiguous with the next consecutively numbered district, as contended by the house, that is not what they grammatically wrote. We conclude that we must interpret the constitutional provision as it has been grammatically written and, consequently, must reject the position of the house. See Johnson v. McDonald, 269 So.2d 682 (Fla. 1972); City of Jacksonville v. Continental Can Co., 113 Fla. 168, 151 So. 488 (1933).

PART III

Objection to Geographic Separation of District 27.
Certain residents in the eastern portion of house district 27 challenge the contiguity of the Volusia County portions of house district 27 with the remainder of that district in Putnam, Marion, Lake, and Seminole Counties. The contention of the objectors is that there is, in effect, nothing more than a "touching" of the eastern and western ends of district 27, and, therefore, the district does not comply with the "contiguous" requirements of section 16(a) of article III. The geography of this area reflects that there is a lake, a river, and an interstate highway connecting two portions of district 27.
We agree with the view expressed in Mader v. Crowell, 498 F. Supp. 226, 229 (M.D.Tenn. 1980), that a "[d]istrict lacks contiguity only when a part is isolated from the rest by the territory of another district." Webster's defines contiguous as "being in actual contact: touching along a boundary or at a point." Webster's New Collegiate Dictionary 245 (1973). We adopt that definition, except that we agree with the law as expressed in Jaffrey v. McGough, 88 Ala. 648, 7 So. 333 (1890),[7] that lands that mutually touch only at a common corner or right angle cannot be regarded as "contiguous" within the proper meaning of the word when applying it in establishing house or senate districts. From our examination of the instant record, including detailed maps, we find that, in regard to house district 27, there is more than just a "touching of corners" and that no part of the district is isolated from another by an intervening district. Hence, it satisfies, but barely, the test of "contiguity."
The objectors contend that the eastern portion of district 27, which lies within Volusia County, should be included within a house district of more compatible interest. The objectors, residents of Volusia County, assert that they should not be required to share a representative with other counties who they believe do not have the same political interests. We find that the objection is not such that requires disapproval of this apportionment plan.

PART IV

Minority Challenges to Certain Districts.
The validity of the joint resolution is challenged by John M. Diaz, who proposes a *1052 "Hispanic fair-play district" as an alternative to the present plan drawn in Dade County. Mr. Diaz asserts that district 112 has been gerrymandered to the detriment of the Hispanic population. The South Dade Black Coalition, consisting of three black persons, contends that districts 117, 118, and 119 in Dade County should be redrawn to provide a larger black concentration in one of those districts. We reject both of these challenges.
In this apportionment process, the sole question to be considered by this Court in this proceeding is the facial constitutional validity of Senate Joint Resolution 1 E. See In re: Apportionment Law Appearing as Senate Joint Resolution 1 E, 1982 Special Apportionment Session, No. 61,933 (Fla. Jan. 18, 1982); In re Apportionment Law Senate Joint Resolution No. 1305, 263 So.2d 797 (Fla. 1972). Therefore, the suggestion that we should adopt an alternative plan is not permissible in these proceedings.
We do, however, recognize that the challenges may be made even though legislative districts may be equal in population because they may still be vulnerable under the Fourteenth Amendment if there is in fact invidious discrimination. Gaffney v. Cummings, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973). In this proceeding, we consider any minority challenge to the plan as raising an issue of whether it invidiously discriminates against any minority group. To show invidious discrimination, the objector to the plan for apportionment must produce evidence which supports the finding that the political process in this apportionment plan was a "purposefully discriminatory denial or abridgement by government of the freedom to vote `on account of race, color, or previous condition of servitude.'" City of Mobile v. Bolden, 446 U.S. 55, 65, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980); see also Milton v. Smathers, 389 So.2d 978 (Fla. 1980). The objectors have the burden to show this Court that the plan was motivated by an intent to discriminate. City of Mobile v. Bolden; McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). Not only does the record in this cause reflect no proof of purposeful discrimination, but, to the contrary, it affirmatively shows provisions which will substantially increase the opportunity for minority participation in the political process in the state, Dade County in particular.[8]
We conclude the present plan does not invidiously discriminate against any racial or language minority for the purpose of minimizing or cancelling the voting strength of either the black or Hispanic population in violation of either the Fourteenth or Fifteenth Amendments, and the objections are, therefore, rejected.

CONCLUSION
It is our judgment, and we so declare, that the apportionment plan presented in SJR 1 E is valid on its face under the constitution of the United States and the constitution of the State of Florida. This holding is without prejudice to the right of any protestor to question the validity of the plan as applied in appropriate proceedings, and we retain exclusive state jurisdiction to consider any and all future proceeding relating to the validity of this apportionment plan. Milton v. Smathers, 389 So.2d 978 (Fla. 1980); Milton v. Smathers, 351 So.2d 24 (Fla. 1977); Cardinas v. Smathers, 351 So.2d 21 (Fla. 1977); In re Apportionment Law Senate Joint Resolution 1305.
We approve the plan. All senators must run for election from the newly-apportioned districts in 1982, with the terms for the senators from odd-numbered districts being two years. No motion for rehearing will be entertained.
It is so ordered.
BOYD, ALDERMAN, McDONALD and EHRLICH, JJ., concur.
*1053 BOYD, J., concurs specially with an opinion.
McDONALD, J., concurs with an opinion, in which EHRLICH, J., concurs.
EHRLICH, J., concurs specially with an opinion.
SUNDBERG, C.J., concurs in part and dissents in part with an opinion, in which ADKINS, J., concurs.
ADKINS, J., concurs in part and dissents in part with an opinion.
BOYD, Justice, concurring specially.
I concur in the majority opinion, but my conclusions concerning the necessity for new elections in odd numbered senatorial districts are also based on another reason.
In pure democracies citizens assemble and by majority vote enact laws and transact other legislative business directly without electing legislators. In republican forms of government such as that used in Florida the voters elect people to represent political entities identified by specific geographic boundaries. The elected senator or state representative hears from the voters during election campaigns and because he presumably knows the will of the people in the geographic area that person is chosen by the electors to represent them and express their views in the Florida State Legislature. Just as a principal appoints an agent who must do the principal's will and an employer hires an employee to do his will so must the legislators do the will of their constituents. Their relationship is contractual in nature and ordinary legal rules on an employment contract must control.
Whenever the identity of one of the contracting parties is destroyed, a contract for personal services terminates due to impossibility of performance. It is the same relationship which occurs when a lawyer or his client dies. The lawyer-client relationship ends.
In the case of odd numbered senate districts reapportionment so modifies the districts that they cease to exist as the same political entities existing in 1980 when candidates were elected to represent the respective districts.
For example, a senator with a background in agriculture might be chosen by voters in a district because of his views about farming matters, but if his agricultural constituency is removed to another district and in exchange he is given a tourist oriented area of people opposed to his views on agriculture he no longer speaks the voice of the people in his new "assigned" district, although he may live in the same home in which he resided when previously elected. Since his prior geographic legislative district is abolished in fact and in law, he must be reelected in order to continue in office.
McDONALD, Justice, concurring.
I concur with the majority opinion and make the following comments, albeit for the most part they are redundant.
The legislature of Florida is to be congratulated on resolving in a fair and equitable manner the designation and definition of house and senate districts. From a population standpoint these districts are near perfect. Heeding suggestions at public hearings, the legislature adopted single-member districts; both the house and the senate were unselfish and statesmanlike in this regard. I can see no constitutional impediment to the joint resolution.
Upon the approval of a resolution of apportionment there will be forty senatorial districts, each of which is different in geography and population from any district that existed prior to the new apportionment plan. Every district is new, and no senator has been elected from a district as newly defined. The districts from which they were elected no longer exist. Article III, section 1 of the Florida Constitution declares that the senate shall be "composed of one senator elected from each senatorial district." To permit a holdover senator to remain in office as the new senator would violate article III, section 1. Districts are constituencies, and it is to these constituencies that the senators must remain accountable.
*1054 I totally reject the argument that article III, section 2, which states that "[e]ach house shall be the sole judge of the qualifications, elections, and returns of its members," supports the senate's contention that the holdover senators need not run. The senate, standing alone, cannot make a legal interpretation of the constitution which is immune from review by this Court on this issue.
There is a valid argument that it is in the best interest of Florida to always have some continuity of experienced senators. This is the most cogent argument available to the senate's position and is the predicate upon which the provision for staggered senate terms lies. Florida has had staggered senate terms for a long time. But this policy has to be weighed against countervailing considerations  the constitutionally protected right to vote for the senator who represents you, that each vote count substantially the same, and that the senator be elected by the people he represents and not by some other voters. I readily recognize that several courts have held that no 14th amendment violation occurs by allowing holdover senators and that delaying voting in newly created districts for two years following reapportionment is constitutionally permissive. In re: Reapportionment of the Colorado General Assembly, No. 82SA6, 647 P.2d 191 (Colo. 1982); McCall v. Legislative Assembly, 291 Or. 663, 634 P.2d 223 (1981); Legislature of State of California v. Reinecke, 10 Cal.3d 396, 110 Cal. Rptr. 718, 516 P.2d 6 (1973); Ferrell v. State of Oklahoma ex rel. Hall, 339 F. Supp. 73 (W.D.Okl.), aff'd, 406 U.S. 939, 92 S.Ct. 2045, 32 L.Ed.2d 328 (1972). Each of these cases ignores Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), wherein the United States Supreme Court found unconstitutional a residency requirement of one year in the state and three months in the county before one could vote. Should not that holding equally apply to a delayed right to vote for one's senator for two years? Under the senate's plan those voters assigned to new districts where there are holdover senators would have their right to vote extinguished for two years. This is no different than a durational residency provision condemned in Dunn v. Blumstein and can be endured only if it is necessary to promote a compelling governmental interest.
Insofar as I can tell, no other state has a provision similar to article III, section 15(a) which reads:
Senators shall be elected for terms of four years, .. . except, at the election next following a reapportionment, some senators shall be elected for terms of two years when necessary to maintain staggered terms.
Some[*] urge that this is a declaration that all senators must run after each reapportionment regardless of the circumstances. I cannot so interpret it, but I do interpret that provision to mean that the four-year terms and the desirability of continuing in office do not override all other considerations. Florida, did not, as was apparently the case in California (see Reinecke), consider stability and continuity in the senate as a compelling state interest in reapportionment years when it enacted section 15(a) of article III. The primary premise in those states allowing holdover senatorial terms is the mandated four-year terms, supported by the public policy supremacy of that fact and that the body doing the apportioning has so ordained it. On the other hand, when the Governor of Alaska, who has the constitutional authority to reapportion Alaska, decided that all senators who went from multi-member districts to single-member districts had to run for election despite the fact that some of their terms were truncated, his action was upheld by the Alaska Supreme Court. Groh v. Egan, 526 P.2d 863 (Alaska 1974).
Absent a mandated policy that continuity in office is required at all times, which I do not perceive in Florida's constitution, I feel that the desirability of continuity in office has to be weighed against the effect on the populace of the newly apportioned districts. *1055 The change in every district has been dramatic. Senate District 25's change is the least severe, but even there a change of 26% of the population exists. When one weighs the right of a significant number of persons to vote for being represented by a senator elected solely by them, the value of their vote compared with those for senators of other newly created districts should prevail over the right of a senator to complete his four-year term and the accompanying desirability of continuity of experienced people. "All political power is inherent in the people." Art. I, § 1, Fla. Const. Let there be an election for all.
EHRLICH, J., concurs.
EHRLICH, Justice, specially concurring.
In oral argument before this Court, both the attorney general and the senate agreed that, if the constituency of a senatorial district is changed by more than fifty percent, a new election would be mandated. They say, in essence, that it is a matter of degree, and if the percentage change is less than fifty, no new election is in order.
Even though I do not agree with their commendably candid analysis, I find it easier to accept than the dissenting opinion of Chief Justice Sundberg, despite the beauty and resonance of his opinion's lilting language.
SUNDBERG, Chief Justice, concurring in part and dissenting in part.
I fully concur with the majority that SJR 1 E passes federal and state constitutional muster as to its reapportionment of voting districts to comport with the standard of "one man  one vote." Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). I also agree that the non-contiguous numbering of the senate districts does not violate the state constitution. I agree that the shape of District 27 complies with the "contiguous" requirement of the constitution. Art. III, § 16(a), Fla. Const. (1968). In spite of my emotional sympathies for the majority's position concerning the terms of senators, I believe in all intellectual honesty that its position is legally and rationally evanescent. As a framer of our constitution I might very well have embraced the concept of truncation of terms after decennial reapportionment as serving an interest superior to continuity. As a judge, I must dissent.
The majority blazes its new trail today without legal support for its decision which truncates four-year terms of the state senators whose terms run beyond the reapportionment year, even though these senators were elected under a plan of apportionment this Court held valid. See In re Apportionment Law Appearing as Senate Joint Resolution Number 1305, 1972 Regular Session, 263 So.2d 797 (Fla. 1972). Truncation has only been ordered by courts where senators were elected under an apportionment plan subsequently found by the court to be unconstitutional. See, e.g., Chavis v. Whitcomb, 307 F. Supp. 1362 (S.D.Ind. 1969) (because act senators elected under unconstitutional, court must scrutinize balance of term), rev'd on other grounds, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); Swann v. Adams, 258 F. Supp. 819 (S.D.Fla. 1965), rev'd on other grounds, 383 U.S. 210, 86 S.Ct. 767, 15 L.Ed.2d 707 (1966); Butcher v. Bloom, 420 Pa. 305, 216 A.2d 457 (1966). Every court which has considered the issue before us has decided that neither notions of equal protection nor representative government were abused by allowing properly elected senators to hold over for their terms beyond reapportionment. Although the majority eschews these cases by asserting the singularity of our state constitution, the parallels are too close to be ignored. California, which has senatorial terms constitutionally set at four years, found no requirement that all its senators must run following reapportionment, since to do so would have interfered with the constitutionally staggered terms and senate continuity. Legislature of California v. Reinecke, 10 Cal.3d 396, 110 Cal. Rptr. 718, 516 P.2d 6 (1973).[1] Ironically, the double truncation *1056 created by this Court, was foreseen as early as 1892 as unwarranted judicial meddling with a constitutional scheme requiring staggered, senatorial terms. People ex rel. Snowball v. Pendegast, 96 Cal. 289, 31 P. 103 (1892):
And another consequence involved in this contention is that not only must the constitutional term of the senators elected in 1890 be reduced by two years, but, unless we are to abandon for all time the constitutional scheme of rotation in senatorial elections, the terms of one half of the 40 senators chosen this year would have to be reduced to two years, in order that half of the senators might be chosen in 1894. But if this were to be done, how would it be done, and by what authority?
Id. at 295, 31 P. at 105. Courts have uniformly recognized staggered terms as a legitimate constitutional prerogative, see Pate v. El Paso County, Texas, 324 F. Supp. 935 (W.D.Tex.), aff'd, 400 U.S. 806, 91 S.Ct. 55, 27 L.Ed.2d 38 (1970), and that some temporary inequity among voters as a result of staggered terms does not rise to the level of constitutional dignity. See Mader v. Crowell, 498 F. Supp. 226 (M.D.Tenn. 1980). The dignity in our constitutional scheme of staggered senatorial terms to promote continuity is evidenced by the fact that, save for the constitution of 1861 which survived only the duration of the Confederacy, every constitution since the territorial constitution of 1838 has contained a provision for staggered senatorial terms.
The position allowing holdover terms under our circumstances is not merely a majority position; it is essentially a unanimous position. The few cases which have truncated terms have done so in clearly different situations. An Alaska court upheld a truncation, where the discretion to shorten terms clearly was lodged in the governor, who had so exercised it. Groh v. Egan, 526 P.2d 863 (Alaska 1974). Senators' terms have been shortened when the number of senate districts was increased and a two-year term was constitutionally mandated to maintain staggered terms. State ex rel Williams v. Meyer, 20 N.D. 628, 127 N.W. 834 (1910). Shortened terms have been upheld when implemented by voter initiative. State ex rel. Christensen v. Hinkle, 169 Wash. 1, 13 P.2d 42 (1932), but no case directly supports the majority's position.
The majority recognizes, quite properly, that we are not slave to this century of reapportionment cases. I approach warily, however, any position which discards so much jurisprudence for a generalized concept of "equity."
Scrutinizing the constitutional language with a cold eye, as a judge must, I am bewildered at the directness of the disputed passage:
Senators shall be elected for terms of four years, those from odd-numbered districts in the years the numbers of which are multiples of four and those from even-numbered districts in even-numbered years the numbers of which are not multiples of four; except, at the election next following a reapportionment, some senators shall be elected for terms of two years when necessary to maintain staggered terms.

Art. III, § 15(a), Fla. Const. (1968) (emphasis added). In a single passage, I am told senate terms will be four years and staggered, except that they shall be two years "when necessary to maintain staggered terms." I ask, is it necessary to elect any senator for two years so that staggered terms can be maintained? I hear only the answer, that it is not necessary after the 1982 reapportionment because the terms will be staggered. I confess this reading evokes a child-like simplicity, but perhaps constitutional interpretation is not the place for a great imagination.
*1057 The historical derivation of article III, section 15(a), lends credence to its straight-forward workings. The 1967 legislature was sorely aware of the series of decisions in Swann v. Adams,[2] which had judicially reapportioned Florida and truncated the terms of legislators. As a result of Swann v. Adams, all representatives and all senators would run for reelection in 1968. The 1967 legislature, in its political wisdom, determined that all senate terms for the 1968 elections would be four years. See ch. 67-479, § 6, Laws of Fla. In the same act, the legislature provided that the next legislature meeting for purposes of apportionment would reimplement staggered terms. See ch. 67-479, § 7, Laws of Fla. In that same year, the same legislature considered the current language of article III, section 15(a), and adopted it the following year but specifically made it inapplicable until the 1972 elections. Art. XII, § 12, Fla. Const.[3] In 1972, all senators were again due to run, the four-year, non-staggered terms having expired. The 1972 legislature, dutiful to the command of the 1967 legislature, implemented article III, section 15(a), by providing in SJR 1305, sections 3 and 4, that senators elected in 1972 from even-numbered districts would serve only for two years. See § 10.05(2), Fla. Stat. (Supp. 1972). The exception embodied in article III, section 15(a), was obviously written in contemplation of the necessity for the 1972 legislature to restagger terms. One might presume further, that the exception was a fail-safe device in the event another apportionment plan were held unconstitutional, so that staggered terms could be reinstated. Another purpose of this exception is to maintain staggered terms if numbers of senators should increase pursuant to article III, section 16(a). But such a historical background presses hard against utilizing this exception to require truncation of terms after every reapportionment when district lines are changed. One may not ignore that had the drafters of section 15(a) desired that all senators run after every reapportionment which changed districts, these words could easily have been provided. Cf. Ill. Const., art. IV, § 2(a) (provides for expiration of all senate terms after reapportionment, allocating two-year burden alternatively between three groups of senators).
As I comprehend the majority's argument, and I confess my comprehension is somewhat imperfect due, in large part, to the logic the argument follows, it begins somewhere in the bowels of Swann v. Adams. A close examination of Swann v. Adams, 258 F. Supp. 819, reveals that the district court there specifically disapproved holdover senators as provided under HB 19-XX, section 1(3) (1965). If one takes the time to read section 1(3), one realizes that the holdover situation there was vastly different from the one we confront:
If by this reapportionment the district of a member of the senate, as now constituted, who is not otherwise assigned a district hereinabove and whose term of office expires with the general election of November, 1968, shall be altered, abolished or the number of his district relocated outside of his present district, then such member shall continue as a senator for the county of his residence during the remainder of his term and shall have an equal vote with any other senator and the number of his senatorial district shall be indicated by adding the letter "X" after the number of the district to which he was elected, even though it increases the maximum number of members herein provided for.
Ch. 65-2440, § 3, Laws of Fla. In this section, the legislature sought to hold over senators who could not be assigned to a new district and who had lost their former district, an effort obviously at odds with Reynolds *1058 v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). But many other senators not described in section 1(3) were held over until the 1968 elections who were assigned a district under the 1965 reapportionment. See ch. 65-2440, § 2, Laws of Fla.; see also ch. 65-2440, § 4, Laws of Fla. (maintaining holdovers). Significantly, Swann v. Adams found no problems with these other holdovers who had been assigned to a district. 258 F. Supp. at 820-21. These assigned holdovers apparently did not trouble the court even though they were elected under an unconstitutional plan.[4] The supplemental opinion of Swann v. Adams, 258 F. Supp. at 826-27 (S.D.Fla. 1966), involved a markedly different legislative reapportionment act, which presented the court with only three holdover senators. In this separate opinion the district court approved these three holdovers since their districts were unchanged, in spite of these senators having been elected under an invalid plan.[5] Because our present senators were elected under a constitutionally valid plan, one cannot imply from the supplemental opinion in Swann v. Adams that for our case only holdovers from identical districts are permissible. The factor of identical districts simply made allowing the hold over of an unconstitutionally elected senator more palatable to the district court. See note 5, supra. But from these cases the idea is born that holdovers are impermissible unless their districts are identical.[6]
The next step is to fit Swann into article III, section 15(a). Finding themselves with a square peg facing a round hole, they proceed to an otherwise unconnected section, article III, section 1, which has octagonal holes that will, with a good bit of pushing, accept their square peg. Article III, section 1, simply vests the legislative power in the senate and house:
The legislative power of the state shall be vested in a legislature of the State of Florida, consisting of a senate composed of one senator elected from each senatorial district and a house of representatives composed of one member elected from each representative district.
From this apparently innocuous language, the majority constructs an answer to whether senate members should be allowed to hold over. It reads, by Swann's guiding light, the words "elected from each senatorial district" to mean "elected from each new senatorial district." Since the present senate was not elected from the newly apportioned districts, it is not elected at all. Thus, the new districts retroactively destroy the districts from which senators were elected in 1980.
Now, one must admit that such a reading is possible; indeed, few readings of a constitution are totally impossible. But the question is whether this reading abuses other parts of the constitution. By adding the term "new" to article III, section 1, the majority gives its implied construction of that section superiority to the explicit requirement of four-year senate terms found in article III, section 15(a). I believe that what the constitution has declared should be superior to what judges create.
*1059 The second effect of this creative reading is to denigrate the constitutionally recognized principle of continuity in the senate. Article III, section 15(a), by allowing shortened terms only when necessary to maintain staggered terms manifested the framers' continued dedication to senate continuity even upon the occurrence of reapportionment of districts. The purpose of a continuous senate is of course deeply imbedded in our nation's history:
The necessity of a senate is not less indicated by the propensity of all single and numerous assemblies, to yield to the impulse of sudden and violent passions, and to be seduced by factious leaders into intemperate and pernicious resolutions. Examples on this subject might be cited without number; and from proceedings within the United States, as well as from the history of other nations. But a position that will not be contradicted, need not to be proved. All that need be remarked is, that a body which is to correct this infirmity, ought itself to be free from it, and consequently ought to be less numerous. It ought moreover to possess great firmness, and consequently ought to hold its authority by a tenure of considerable duration.
The Federalist No. 62, at 348 (J. Madison) (1826). By providing for staggered terms, our constitution mandated that one-half of the senate remained each election year to insure uniformity, order, and a constant succession of official information. The majority has decided that its implied interpretation is paramount to this principle.
The final leg of the majority's position is set into an ideal of representation. Even though our constitution in certain terms requires only that a senator shall be "elected from" each district, the majority implies a right of an elector to be represented by a legislator which the elector has both voted for and who represents the elector's district. This notion of personal representation has consistently been rejected by courts.
The idea that we are personally represented and represented only by officials for whom we have voted stretches too far the theory of representative government.
... .
... A Senator represents either the people of the state as a whole, as suggested by the trial court, or the people within the district existing during his tenure of office. He is not a mere mouthpiece for those who voted for him. He is a legislative representative of the people exercising his authority for the welfare and protection of all.
Selzer v. Synhorst, 253 Iowa 936, 947-48, 113 N.W.2d 724, 730-31 (1962). Courts have not treated election districts as political units, and those elected from a district are not equivalent to heads of local governmental units:
In the case of a member of the legislature, although he is chosen from, and must reside within, his district, he performs no official function therein. Instead of acting individually within his district, he becomes a member of an organization which acts only in its organic capacity, and at the capital of the state. He is in a certain sense an officer of the state, and, with others, constitutes a department of the state government. The district from which he is elected is not a municipal or quasi municipal corporation, and it never acts or is dealt with as a political entity. Districts are provided to create a system by which the members will be close to the people which they represent, and from which members are to be elected. In creating districts for this purpose, the legislature fixes the boundary lines, and designates them by numbers; but that is the extent of the organization, and the only reason for their existence. The voters within the limits of a district are an electoral body who choose one of their number to represent them in the legislature, and no other action is ever taken by them as a result of such organization. The member is therefore not an officer of the district, as the probate judge is an officer of the county, or a justice of the peace an officer for the township. The matter of apportionment is only a provision for future elections, and is not designed to affect *1060 the title to office, or the tenure of the members making the apportionment.
Farrelly v. Cole, 60 Kan. 356, 384-85, 56 P. 492, 501 (1899) (emphasis added). This distinction between the right to elect and right to representation is most notable in McCall v. Legislative Assembly, 291 Or. 663, 634 P.2d 223 (1981), which construed the special language of the Oregon Constitution as not merely requiring a district to have elected a legislator but also that the district must have identifiable representation. The Oregon court later made clear, however, that holdover senators were permissible, so long as each district had a senator assigned to it after reapportionment. See Cargo v. Paulus, 291 Or. 772, 635 P.2d 367 (1981). The problem in McCall was that no holdover senator had been assigned to one district. The Colorado Supreme Court also recently reached a similar conclusion based on its constitution which contained language very similar to the Oregon Constitution.[7]See In Re: Apportionment of the Colorado General Assembly, 647 P.2d 191 at 197-199 (Colo. Feb. 19, 1982). In Apportionment of the Colorado Assembly, the court found that the new plan drew district lines so that the residences of two incumbent senators were in the same new district, leaving another new district with no resident senator. Because no senator resided in this one district, the court held that district must have a senator elected in 1982, not 1984 as the plan provided. But the court specifically noted that holdover senators did not violate "one person  one vote," and that the incumbents could serve their full terms.[8]Id. at 198. Both of these cases allowed holdover senators, and merely required that the new district have a senator properly allocated to it. Our plan appears to have satisfied this type of allocation. Personal, identifiable representation is not required, because neither case required those who elected a given senator to also be represented by that senator.
Although the majority does not address the case, certain proponents of mid-term elections argue that Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), applies to our case, and the state must demonstrate a compelling interest to support the partial disenfranchisement which occurs after this reapportionment. Dunn held equal protection was denied to newly resident voters by durational residence requirements. One of the central concerns of the Supreme Court was the impingement on the right to interstate travel, an issue not at hand in our case. The court also chastised the residence requirement as being overbroad in its attempt to maintain integrity of the voting process. Here, there is no reasonable and narrower means of maintaining continuity of the senate. Finally, federal courts which have faced the equal protection argument predicated on the Dunn rationale have flatly rejected it. See Mader v. Crowell; Ferrell v. State ex rel. Hall, 339 F. Supp. 73 (W.D.Okla.), aff'd, 406 U.S. 939, 92 S.Ct. 2045, 32 L.Ed.2d 328 (1972). The court in Ferrell noted that this partial, temporary disenfranchisement was of the same sort as happened "with regard to new registrants who reach the age of 18 years shortly after an election and to people moving from one area to another." Id. at 82.
This Court has made a choice that a policy of perfect enfranchisement is paramount to the demonstrable text of the constitution requiring four-year senate terms. The choice may achieve a commendable result, but let us not presume that it is legally *1061 sound. The choice may be thought the wiser, but let us not believe that it is a rational reading of our constitution. Rather, let us face that the Court has wrought an intrusion into our constitutional scheme, an intrusion that is wholly court created. I cannot support such creative interferences, because I perceive it is my task to interpret, not write, the constitution.
In my considered judgment the senators elected from odd-numbered districts in the election of 1980 continue in office for a term expiring at the election of 1984 notwithstanding the adoption of the plan of apportionment approved herein. Those senators would represent all of the residents of the odd-numbered senate districts described in SJR 1 E  electors or not.
ADKINS, J., concurs.
ADKINS, Justice, concurring in part, dissenting in part.
In my opinion, Senate Joint Resolution 1 E constructs districts, in both houses of the Florida Legislature, in accordance with the equal protection clause of the fourteenth amendment. It apportions the Florida Legislature into consecutively numbered districts of either contiguous, overlapping, or identical territory, pursuant to article III, section 16(a), Florida Constitution. It does not invidiously discriminate against any racial or language minority for the purpose of minimizing or canceling the voting strength of such minority. It represents an affirmative effort to maximize the opportunity for minority participation in the political processes of Florida. I concur in the decision of the majority which approves the plan of apportionment.
I dissent from Part I of the opinion. It is my view that incumbent senators who were elected to four-year terms from odd-numbered districts in 1980 are not automatically prevented from serving out the remainder of their terms by virtue of reapportionment. Article III, section 15(a), Florida Constitution, mandates four-year terms for senators, "except, at the election next following a reapportionment, some senators shall be elected for terms of two years when necessary to maintain staggered terms." The effect of the majority opinion is to amend section 15(a) so as to provide for an election for terms of two years at the election immediately preceding a reapportionment. It is elementary that where a constitution sets forth an express exception, no others may be implied. See 30 Fla.Jur. Statutes, § 136.
In McPherson v. Flynn, 397 So.2d 665, 667 (Fla. 1981), we said:
As the United States Supreme Court has pointed out under the parallel articles of the federal constitution, the doctrine of separation of powers requires that the judiciary refrain from deciding a matter that is committed to a coordinate branch of government by the demonstrable text of the constitution.
We should only intrude into this political machinery and truncate the terms of senators if the shift from single and multi-membered districts to single-member districts, and the two-year postponement of the voting rights of a small percentage of the state population, rises to the magnitude of invidious discrimination under the equal protection clause of the Fourteenth Amendment. Public policy under the doctrine of separation of powers suggests that the issue of elections of senators rests with another coordinate branch of this state's government.
The equal protection clause of the Fourteenth Amendment does not require that senators elected in 1980 to four-year terms run for reelection in 1982. See Legislature of the State of California v. Reinecke, 10 Cal.3d 396, 110 Cal. Rptr. 718, 516 P.2d 6 (1973); Ferrell v. State of Oklahoma, 339 F. Supp. 73 (W.D.Okl. 1972), aff'd sub. nom. Ferrell v. Hall, 406 U.S. 939, 92 S.Ct. 2045, 32 L.Ed.2d 328 (1972); Mader v. Crowell, 498 F. Supp. 226 (M.D.Tenn. 1980).
These cases are representative of decisions throughout the country which have held that holdover terms do not constitute a violation of the equal protection requirement. Robinson v. Zapata County, Texas, 350 F. Supp. 1193, 1196 (S.D.Tex. 1972); Carr v. Brazoria County, Texas, 341 F. Supp. 155 *1062 (S.D.Tex. 1972), aff'd 468 F.2d 950 (5th Cir.1972); Pate v. El Paso County, Texas, 337 F. Supp. 95 (W.D.Tex. 1970), aff'd without opinion, 400 U.S. 806, 91 S.Ct. 55, 27 L.Ed.2d 38 (1970); Long v. Docking, 283 F. Supp. 539 (D.Kan. 1968); Stout v. Bottorff, 249 F. Supp. 488, 495 (S.D.Ind. 1965); In Re Apportionment of Colorado General Assembly, 647 P.2d 191 (S.Ct.Colo. 1982), modified, No. 825A6, (S.Ct.Colo. Feb. 19, 1982), modified, 647 P.2d 209 (S.Ct. Colo. 1982); Barnett v. Boyle, 197 Neb. 677, 250 N.W.2d 635, 637 (1977); People v. Lavelle, 56 Ill.2d 278, 307 N.E.2d 115 (1974); Visnich v. Sacramento County Bd. of Education, 37 Cal. App.3d 684, 112 Cal. Rptr. 469 (1974); Griswold v. County of San Diego, 32 Cal. App.3d 56, 107 Cal. Rptr. 845, 849-50 (1973); Marston v. Kline, 8 Pa.Cmwlth. 143, 301 A.2d 393 (1973); New Democratic Coalition v. Austin, 41 Mich. App. 343, 200 N.W.2d 749, 755 (1972); Twilley v. Stabler, 290 A.2d 636, 638 (Del. 1972); Yates v. Kelly, 113 N.J. Super. 533, 274 A.2d 589 (1971); Harris v. Shanahan, 192 Kan. 183, 387 P.2d 771, 796 (1963); Anggelis v. Land, 371 S.W.2d 857, 859 (Ky.App. 1963); Selzer v. Synhorst, 253 Iowa 936, 113 N.W.2d 724 (1962); Farrelly v. Cole, 60 Kan. 356, 56 P. 492, 500-01 (Kan. 1899). Cf. McCall v. Legislative Assembly, 291 Or. 663, 634 P.2d 223 (1981).
If the framers of our constitution intended that all members of the senate with staggered terms should run for reelection immediately following reapportionment, they would have included such a requirement in the constitution. Apparently the framers of the constitution thought that the desirability of maintaining a senate, of which at least one-half of the members are always experienced men or women, was more beneficial to the state after reapportionment than providing that each person in the state must be represented in the senate by a senator of their own choosing. See Anggelis v. Land, 371 S.W.2d 857, 859 (Ky. App. 1960).
Many jurisdictions have held that incumbent senators can hold over after a reapportionment and the majority has rejected challenges of alleged dilution or disenfranchisement of the right to vote. Legislature of State of California v. Reinecke; Ferrell v. State of Oklahoma ex rel. Hall; Anggelis v. Land; Mader v. Crowell; New Democratic Coalition v. Austin; Carr v. Brazoria County, Texas.
However, it is generally held that courts have complete jurisdiction to truncate senatorial terms and order new elections immediately after finding that state senators were elected under an unconstitutional apportionment plan. Mann v. Davis, 238 F. Supp. 458 (E.D.Va. 1964), aff'd 379 U.S. 694, 85 S.Ct. 713, 13 L.Ed.2d 698 (1965); Sims v. Amos, 336 F. Supp. 924, 940 (M.D. Ala. 1972); Butcher v. Bloom, 420 Pa. 305, 216 A.2d 457, 459 (1966); and Chavis v. Whitcomb, 307 F. Supp. 1362 (S.D.Ind. 1969), rev'd on other grounds, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971).
This principle and these cases are not relevant here because Florida's 1972 apportionment plan was valid, In re Apportionment Law Senate Joint Resolution 1305, 263 So.2d 797 (Fla. 1972), and senators elected thereunder were not elected from malapportioned districts. Reynolds v. Sims, 377 U.S. 533, 534, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).
The geographic boundaries of each district will change every ten years if our population increases or decreases. The ideal district (the total population divided by the number of districts) will expand or decrease in geographic size, thus necessitating, under the majority view, the election of a new senate in 1992. Half of those elected in 1990 would receive commissions for four-year terms. Their commissions will mean nothing, because all senators will be required to run in 1992. The exception in section 15(a) has been amended by the judicial mandate of the majority so as to read: "except at the election next preceding and next following a reapportionment, some senators shall be elected for terms of two years when necessary to maintain staggered terms."
This method of amending the constitution was never contemplated by the framers or the people who had full confidence that this *1063 Court would exercise judicial restraint in considering this political question.
The concept adopted by the majority in the face of a staggering number of contrary authorities may be a desirable one, but a similar concept proposed by a constitution revision commission was soundly rejected by the people. It is sad that we have warped the constitution with this strained construction.
NOTES
[1] Joint Resolution No. 1E
A joint resolution of apportionment; providing for the apportionment of the House of Representatives and the Senate; adopting the federal decennial census for use in such apportionment; providing for omitted areas; providing severability of invalid portions.
Be It Resolved by the Legislature of the State of Florida:
Section 1. (1) In accordance with s. 8(a), Art. X of the State Constitution, the federal decennial census of 1980 is the official census of the state for the purposes of this resolution.
(2) The following delineation of areas to be included in each representative and senatorial district employs the official census county divisions (CCD), tracts, block numbering areas (BNA), block groups, blocks, and enumeration districts (ED) utilized by the United States Department of Commerce, Bureau of the Census, in compiling the federal decennial census of 1980 in the State of Florida. The populations within these census geographic units are the population figures reported in the official 1980 federal decennial census counts provided to the State of Florida in accordance with Pub.L.No. 94-171.
(3) As used in this joint resolution:
(a) "Block" means the smallest geographic unit for which population was ascertained in taking the 1980 census.
(b) "Block group" means a combination of blocks within a single tract or block numbering area, wherein the numbers of the blocks begin with the same digit.
(c) "Block numbering area," or "BNA," means an area of blocks within a county that does not have identified tracts.
(d) "Tract" means a combination of block groups or enumeration districts.
(e) "Enumeration district," or "ED," means the smallest geographic unit for which population was ascertained in taking the 1980 census in counties, or portions thereof, where blocks are not identified.
(f) "Census county division," or "CCD," means an administrative division of a county which contains tracts, enumeration districts, or block numbering areas, or some combination thereof.
Section 2. The House of Representatives shall consist of 120 consecutively numbered, single-member, representative districts of contiguous territory. The state shall be apportioned into representative districts as follows:
(Description of districts omitted.)
Section 3. The state is hereby divided into 40 consecutively numbered, single-member senatorial districts of contiguous territory as follows:
(Description of districts omitted.)
Section 4. Any portion of the State of Florida which is not stated herein as being included in any district described in this resolution but which is entirely surrounded by a district shall be deemed included in that district. Any portion of the state which is not included in any district described in this resolution and which is not entirely surrounded by a district shall be included within that district contiguous to such portion which contains the least population per legislator according to the federal decennial census of 1980 of Florida.
Section 5. (1) The Senate has determined that senators elected in 1980 from odd-numbered districts should continue in office until 1984. The House of Representatives has determined that elections should be held in 1982 for all senate districts as apportioned by this resolution. Despite good-faith efforts to resolve their differences on this issue, the Senate and the House of Representatives have been unable to agree on the foregoing issue and request the Supreme Court of Florida to take jurisdiction pursuant to Article III of the Florida Constitution, and resolve this and all other issues relating to apportionment.
(2) The numbering of senate districts as it appears in this joint resolution is the numbering passed by the Florida Senate. The Senate interprets the Constitution of Florida to require only that district numbers be consecutive and that the territory within each district be contiguous. The House of Representatives interprets the Constitution of Florida to require that the territory within each district be contiguous and that each district be contiguous with the next consecutively numbered district; and has adopted the policy that districts should be so numbered. The inclusion of the numbering herein shall not be construed as an endorsement by the House of Representatives of such numbering pattern. Neither the numbering of senate districts provided for in this resolution nor any other language or provision of this resolution shall be construed as a declaration of legislative intent by the House of Representatives that senators in odd-numbered districts should continue in office until 1984.
(3) The Legislature urges the Supreme Court of Florida to take jurisdiction of this joint resolution pursuant to the laws and constitutions of the United States and the State of Florida and determine all issues relating to apportionment in the state.
Section 6. In the event any section, subsection, sentence, clause, or phrase of this resolution or any senatorial or representative district established herein shall be declared, determined to be, or adjudged invalid or unconstitutional, such adjudication shall in no manner affect the other sections, subsections, sentences, clauses, or phrases of this resolution, or any other districts established herein, which shall remain of full force and effect, as if the section, subsection, sentence, clause, phrase or district so declared, determined to be, or adjudged invalid or unconstitutional were not originally a part thereof. The Legislature hereby declares that it would have passed the remaining parts of this resolution as if it had known such part or parts hereof would be declared, determined to be, or adjudged invalid or unconstitutional.
[2] The attorney general states that the exception provision of 15(a) would be given meaning and effect in the following instances: (1) The legislature may set membership of the senate from thirty to forty members per article III, section 16(a), Florida Constitution. If set at thirty in one reapportionment and raised, e.g., to forty in the next, then one-half of the ten new members would have to be elected to terms of two years and one-half to terms of four years to maintain staggered terms of the additional ten members. (2) If after reapportionment a court should invalidate the apportionment plan in whole or in part and require senators to run again under a court-imposed plan, as happened in 1967, then some senators may have to be elected for two-year terms in order to maintain staggered terms. (3) Should any senator previously elected from an even-numbered district be switched in the reapportionment plan to an odd-numbered district in 1982, then such senator must run because his four-year term expires in 1982. Because section 15(a) requires odd-numbered senators to run in even-numbered years the numbers of which are multiples of four (1984), such election in 1982 would be for a two-year term in order to maintain staggered terms. (4) If an odd-numbered incumbent senator no longer resides in the new district within the meaning of article III, section 15(c), and article X, section 3, Florida Constitution, then a vacancy occurs requiring an election in 1982 pursuant to article III, section 15(d), Florida Constitution. Because section 15(a) requires odd-numbered senators to run in even-numbered years the numbers of which are multiples of four (1984), such election in 1982 would be for a two-year term in order to maintain staggered terms. (5) Where two odd-numbered incumbent senators reside in a newly-drawn odd-numbered district, then such senators must run for the single seat available for a term of two years in order to maintain staggered terms and comply with the section 15(a) mandate that odd-numbered senators run in even-numbered years the numbers of which are multiples of four (1984). See Ferrell v. Oklahoma ex rel. Hall, 339 F. Supp. 73, 81 (W.D.Okl.), aff'd, 406 U.S. 939, 92 S.Ct. 2045, 32 L.Ed.2d 328 (1972).
[3] Accord Robinson v. Zapata Co., 350 F. Supp. 1193 (S.D.Tex. 1972); Carr v. Brazoria Co., 341 F. Supp. 155 (S.D.Tex.), aff'd, 468 F.2d 950 (5th Cir.1972); Pate v. El Paso Co., 337 F. Supp. 95 (W.D.Tex.), aff'd, 400 U.S. 806, 91 S.Ct. 55, 27 L.Ed.2d 38 (1970); Long v. Docking, 283 F. Supp. 539 (D.Kan. 1968); Stout v. Bottorff, 249 F. Supp. 488 (S.D.Ind. 1965); Visnich v. Board of Educ., 37 Cal. App.3d 684, 112 Cal. Rptr. 469 (1974); Griswold v. County of San Diego, 32 Cal. App.3d 56, 107 Cal. Rptr. 845 (1973); In re Reapportionment of Colo. Gen. Assembly, 647 P.2d 191 (Colo. 1982); People v. Lavelle, 56 Ill.2d 278, 307 N.E.2d 115 (1974); Selzer v. Synhorst, 253 Iowa 936, 113 N.W.2d 724 (1962); Harris v. Shanahan, 192 Kan. 183, 387 P.2d 771 (1963); Anggelis v. Land, 371 S.W.2d 857 (Ky.App. 1963); New Dem. Coalition v. Austin, 41 Mich. App. 343, 200 N.W.2d 749 (1972); Barnett v. Boyle, 197 Neb. 677, 250 N.W.2d 635 (1977); Yates v. Kelly, 113 N.J. Super. 533, 274 A.2d 589 (1971); Marston v. Kline, 8 Pa.Commw. 143, 301 A.2d 393 (1973).
[4] Swann v. Adams (Swann I), 208 F. Supp. 316 (S.D.Fla. 1962); Swann v. Adams (Swann II), 214 F. Supp. 811 (S.D.Fla. 1963), rev'd, 378 U.S. 553, 84 S.Ct. 1904, 12 L.Ed.2d 1033 (1964); Swann v. Adams (Swann III), 258 F. Supp. 819 (S.D.Fla. 1965), rev'd, 383 U.S. 210, 86 S.Ct. 767, 15 L.Ed.2d 707 (1966); Swann v. Adams (Swann IV), 258 F. Supp. 819 (S.D.Fla. 1965), rev'd, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967); Swann v. Adams (Swann V), 263 F. Supp. 225 (S.D.Fla. 1967).
[5] The exception clause of section 15(a), article III, was not presented to the legislature in the 1968 Constitution Revision Commission preliminary draft. Florida Constitution Revision Commission, 1965-1967. Proposed Revised Constitution of Florida, November 10, 1966 (as amended at the Commission sessions November 28, 1966, through December 16, 1966), at 17: Florida State Archives, RG005, Series 727, Box 1, file 4. The amendment was added by the senate on August 28, 1967, after being proposed by Sen. Friday; the house adopted the proposal, offered by Rep. Pettigrew, on August 30, 1967. Journal of the Senate, Special Session Aug. 21, 1967  Sept. 1, 1967, at 30; House of Representatives, Minutes of the Proceedings of the Committee as a Whole, Amend. No. 652 to HJR 3-XXXX(67), at 3: Florida State Archives, RG005, Series 727, Box 4, file 10.
[6] Jefferson, Madison, Nassau, Flagler, St. Johns, Glades, Highlands, Okeechobee, Hendry, and Indian River.
[7] Accord Western Nat'l Bank v. Village of Kildeer, 19 Ill.2d 342, 167 N.E.2d 169 (1960); Stewart Concrete & Material Co. v. James H. Stanton Constr. Co., 433 S.W.2d 76 (Mo. App. 1968).
[8] In Dade County, under the proposed apportionment plan, there will be two senate districts that include a Hispanic population of fifty-five percent or higher, and one senate district with a black population of sixty-five percent. There are three house districts with a black population of fifty-nine percent or higher, and seven house districts with a Hispanic population of fifty-eight percent or higher. District 112, which is challenged for its dilution of Hispanic population, is sixty percent Hispanic.
[*] Florida League of Women Voters, Senator Paul Steinberg.
[1] The majority asserts that all cases from other jurisdictions should be ignored since Florida's constitution is unique. Although our constitution is without exact duplicate elsewhere, it certainly is not without parallel. Indeed, the California Constitution provides that senators shall serve four-year, staggered terms. Cal. Const., art. IV, § 2(a). The exception embodied in our constitution which allows shortened terms only when necessary to maintain staggered terms, serves more to illustrate the importance of the principle of continuity to the framers, than it does to separate our constitution from those of the rest of the nation.
[2] Swann v. Adams, 258 F. Supp. 819 (S.D.Fla. 1965), rev'd, 383 U.S. 210, 86 S.Ct. 767, 15 L.Ed.2d 707 (1966); 258 F. Supp. 819 (S.D.Fla. 1965) (supp.op.), rev'd, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967); 263 F. Supp. 225 (S.D.Fla. 1967).
[3] In this regard, it is interesting to note that the exception language of section 15(a) was not the product of the 1965-67 Constitution Revision Commission. The provision was added by the legislature after originating in a legislative committee.
[4] The holdovers in Swann v. Adams, 258 F. Supp. 819 (S.D.Fla. 1965), were elected in 1964 under a 1963 plan which had originally been approved by the district court, Sobel v. Adams, 214 F. Supp. 811 (S.D.Fla. 1963). This approval was reversed by the Supreme Court in Swann v. Adams, 378 U.S. 553, 84 S.Ct. 1904, 12 L.Ed.2d 1033 (1964), due to the intervening decision of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). On remand, the district court deferred to the 1965 legislature, stating that the court would reapportion the state if the legislature did not. See Swann v. Adams, 383 U.S. 210, 210-11, 86 S.Ct. 767, 15 L.Ed.2d 707 (1966). It is therefore clear that the 1963 plan did not pass constitutional muster.
[5] No one disputes that if a senator were elected under an invalid plan, the court could truncate the senator's term. The district court in Swann was apparently exercising its discretion in allowing these senators to hold over. See Sims v. Amos, 336 F. Supp. 924 (M.D.Ala.) (although recognizing its power to order mid-term elections as plan unconstitutional, court refrains from so doing at its discretion), aff'd, 409 U.S. 942, 93 S.Ct. 290, 34 L.Ed.2d 215 (1972).
[6] Reliance on Swann v. Adams by the majority is particularly inappropriate since that case did not interpret the provision now before us.
[7] Colo.Const., art. V, § 48(1)(a), provides, "the senatorial districts and representative districts shall be established, revised, or altered, and the members of the senate and the house of representatives apportioned among them, ... ."

Or.Const., art. IV, § 6(1), provides, "[t]he number of senators and representative shall, ... be fixed by law and apportioned among the several counties... ." A county or district "shall be entitled to a member."
[8] The Colorado legislature enacted a provision making clear that no senate term should be shortened after reapportionment. Colo. Rev. Stat. § 2-2-504 (1980 Repl.Vol. 1B). The majority in our case would hold such an act unconstitutional by its interpretation which requires all senators to run unless districts are identical.